745 A.2d 408

**In re JUSTIN D.**

**In re Joshua R.**

**No. 61, Sept. Term, 1999.**

Court of Appeals of Maryland.

Feb. 8, 2000.

432

Martha Weisheit, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Appellants.

C.J. Masserschmidt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

WILNER, Judge.

These two appeals, which we consolidated, are from orders of the District Court of Maryland, sitting as the juvenile court in Montgomery County. In each case, the child—Justin D. and Joshua R., respectively—had been declared a child in need of assistance (CINA) and committed to the custody of the Department of Social Services (DSS). The appeals arise from orders entered in subsequent review hearings that effectively continued a previous placement arrangement and provided that visitation between the child and his mother would be "under the direction of" DSS. The mothers, appellants here, complain that such an order constitutes "an unconstitutional delegation of judicial power." Although the record indicates that the court's intent and announced decision did not amount to such a delegation, the actual written orders entered by the court were too broad.

## BACKGROUND

### Justin D.

Justin first came to the attention of DSS in January, 1993, when the agency received a report that the child, then 10 years old, had been sexually abused by his 14-year-old brother, Imari, approximately a year earlier, in December, 1991. Justin reported the event to a school official, who, in turn, contacted DSS. Following an investigation, DSS devised a safety plan calling for Imari's temporary removal from the home, individual family counseling, and further monitoring. Imari returned home after three days and no further incidents

of that nature were reported. Imari has consistently denied having abused his brother, and the allegation has never been independently confirmed, notwithstanding that in some subsequent psychiatric or social service reports, it seems to have been assumed. Indeed, the uncertainty surrounding the allegation has been one of the root problems in dealing with Justin. Justin's parents never accepted that the event described by Justin occurred, which, in part, contributed to depression and other disorders on Justin's part and to concern on the part of DSS, some of Justin's therapists, and the court as to the ability or willingness of the parents to deal with Justin's problems.

A second incident occurred in March, 1993, when Justin, while at school, took an overdose of antibiotic medication. His father was called and was, at first, reluctant to go to the school, stating that Justin was simply "having a pity party." He did go, however, and, while he and Justin were in the lavatory, the father slapped Justin, in the process scratching his face and causing Justin to bleed. There were no serious physical injuries, but Justin was taken to the hospital for evaluation and eventually placed, temporarily, with his adult half-sister, Danielle.

On April 7, 1993, the juvenile court declared Justin a CINA, committed him to DSS with permission for him to return home under the general direction and guidance of DSS and subject to the conditions that the family participate in a counseling program under the direction of DSS and that Justin was not to have any unsupervised contact with Imari. Justin returned home that day. Psychiatric reports prepared on Justin and Imari showed that Justin was a morbidly or pre-morbidly obese child who was in a significant amount of emotional distress arising from his earlier complaint of sexual abuse, which no one seemed to believe. There was a substantial degree of sibling rivalry between Justin and Imari.

In a dispositional order entered in June, 1993, the court continued the existing arrangement. By December, however, there was concern that Justin's emotional problems were not

being adequately addressed. He had been truant from school 75% of the time; he had continued to gain weight—at 11 years of age, he weighed 200 pounds; he had trouble sleeping; and the parents had not fully cooperated with recommended therapy. Due to "the difficulty in motivating the ... family to implement behavioral changes which would reduce the risk of further abuse towards Justin and attend to the significant issues regarding his health and education," DSS recommended a comprehensive evaluation by the Regional Institute for Children and Adolescents (RICA). On December 1, the court ordered that Justin be removed from the home and sent to RICA for evaluation.

The child was returned to his parents on March 23, 1994, under a joint commitment to DSS, the Secretary of Health and Mental Hygiene, and the Montgomery County Public Schools, with a continued placement in the RICA day program. A year later, due largely to his continued truancy, obesity, and borderline hypertension, the court, on recommendation of RICA, continued the commitment to DSS but ordered placement at a RICA residential unit and directed the parents to cooperate with RICA. There was considerable concern about his obesity; Justin had gained 35 pounds and, at age 12½, was five feet tall and weighed 243 pounds. He was diagnosed as having major depression, an eating disorder, obesity, and borderline hypertension.

Justin remained at RICA for 20 months, eventually with weekend passes at home. During that period, his half-sister, Danielle, attended every family therapy session and served as significant support. The parents, on the other hand, though maintaining consistent telephone contact with Justin and his therapist, frequently canceled or showed up late for therapy sessions; the mother missed two out of the four sessions, and, although the father attended three, he was 20 minutes late for each of them. In August, 1995, Justin's other half-sister, Andrea, expressed concern that Justin was unsafe in his parents' home due to their use of illegal substances. Those allegations were supported by Justin. As a result, the court, in August, 1995, limited the parents' contact to supervised

visitation at RICA but permitted weekend visits with Danielle. The court noted that the continued placement was made "despite reasonable efforts having been made to have said child [returned to his] home."

Following that order, Justin's father ceased visits altogether. Eventually, the parents separated, and the mother, it appears, moved in with Danielle. The mother made an effort to be more available to Justin but continued either to cancel visits or arrive late for them. A progress report in November indicated that Justin was angry and disappointed about her inconsistency and remained doubtful "that she will ever be a reliable and reassuring figure in his life." The mother began substance abuse treatment in September but discontinued it in early October, giving as a reason her impending move from Danielle's home into a home of her own. The therapist also expressed concern about the mother's intent to bring Imari into her home. Imari was also a chronic truant who had recently been arrested for stealing a car. In November, 1996, the court continued the commitment to DSS and the Secretary of Health and Mental Hygiene, designated Danielle as his primary guardian, and provided for placement in her home. This was based, in part, we assume on the therapist's note that Danielle had been "an enormous support to Justin throughout his residential treatment." The court noted in its order that Justin's parents "will not solve issues of imminent danger and [Justin] continues to need the services of the Court." As a condition of the placement, the court ordered that Justin was to have "no contact whatsoever with the homes of father or mother."

A DSS status report prepared in anticipation of a review hearing in May, 1997 showed that Justin had progressed well in his sister's care, that the father essentially had disappeared, that the mother was inconsistent in attending family therapy, and that Justin remained "very angry and confused about his parents' lack of participation in his treatment." DSS recommended a continuation of the existing arrangement but noted that its permanency plan for Justin was "long term foster care relative placement with his sister." The RICA staff concurred

in the DSS recommendation that the existing arrangement be continued. It added that Justin should "continue to have only supervised visits with his parents and that [the parents] be required to participate in Family Therapy as a condition of visitation." With these recommendations, the court, in May, 1997, continued the existing arrangement. The order stated, in relevant part, that Justin was to remain with Danielle under the jurisdiction of the court and the supervision of DSS. Visitation with the parents was to be "under the direction" of DSS and Danielle.

A similar order was entered in May, 1998, as well. A DSS status report noted that Danielle was "the only consistent family member in [Justin's] life" and that Justin remained "very frustrated regarding his parents' lack of involvement in his treatment at RICA." A court-appointed special advocate for Justin concurred in RICA's recommendation that the existing arrangement be continued. The court order directed that the parents participate in family counseling at RICA, that there were to be no overnight visits without Danielle's permission, and that all visits with the parents were to be under the direction of DSS.

The event that spawned this appeal was the review hearing held in January, 1999. A status report prepared by RICA confirmed Justin's progress and contained the same recommendations made earlier—continued commitment to DSS, placement with Danielle, only supervised visits with the parents and no overnight visits. DSS concurred but recommended that Justin, then 16, participate in an independent living program, to plan for the time when he will live independently. At the review hearing, the mother, apparently for the first time, objected to the condition that there be no overnight visits and to the requirement that visitation be under the direction of DSS. Through counsel, she noted that Justin was 16 and urged that there was no danger to him from unsupervised overnight visits. She pointed out that, as Imari was then incarcerated, he was not in the home. She also stated that she agreed to go to monthly therapy "as best she can," considering her current health problems, which were unspeci-

fied. Counsel argued that the mother "ought to have the opportunity to question the Department when it makes decisions about overnights," and that, if DSS decided not to allow overnight visitation, to have the court listen to the facts and make the decision. Citing *Shapiro v. Shapiro*, 54 Md.App. 477, 458 A.2d 1257, *cert. denied*, 296 Md. 655 (1983), she contended that the court needed to decide whether there will be overnight visitation and that it could not delegate that decision to DSS. She asked that the court allow overnight visitation and not have it under the direction of DSS.

The court found *Shapiro* distinguishable in that it did not involve a CINA but was instead a battle between two parents. It noted the concern raised by the mother, however, and attempted to address it. It advised the mother, through her attorney, that, if she felt that DSS was withholding visitation improperly, she should first attempt to resolve the dispute with the Department and Justin's attorney. If the problem was with the particular social worker, the mother could go to the supervisory level or to the county attorney, and, if that failed to resolve the problem, the court would resolve it. It said, "if I think the Department's being not just injudicious but somehow irrational about it, I wouldn't hesitate to enter the appropriate order." After considering the various recommendations before it, only one of which—the one dealing with visitation—was objected to, the court entered an order continuing its jurisdiction, the commitment to DSS, and Justin's placement with Danielle, and, as it had consistently in the past, provided that "[v]isitation between Justin and his mother to be under the direction of [DSS]." As before, the parents were ordered to participate in family counseling at RICA.

The mother's appeal is from that order. At oral argument, we were advised that, in July, 1999, following a regularly scheduled review hearing, the court entered a similar order, from which no appeal was taken.

### *Joshua R.*

Joshua and his two older brothers were declared CINA in February, 1989, when Joshua was only two. The basis for the

finding was the disappearance of the children's father, "their mother's continued drug use," and her inability "to protect them from the drug activity that surrounds them." Evidence was presented that the mother used her available funds on drugs and left the children with no food or supervision. Joshua was committed to DSS and placed in foster care. The mother was given "reasonable visitation under the direction of [DSS]."

Similar orders were entered following periodic review hearings in 1990 and 1991. During that two-year period, Joshua resided in three different foster homes. That, coupled with the initial neglect, led to the development of serious emotional and behavioral problems. As early as September, 1989, he was extremely hyperactive and aggressive. Reunification was apparently considered in 1990 but was deferred because the mother was again pregnant—the father being unknown—and there was concern over her ability to care for Joshua. Although a DSS status report in July, 1991 found Joshua doing well with his then-current foster family, in September, 1991, it sought an emergency hearing and requested that Joshua be hospitalized "because of his serious emotional and behavioral problems." On that petition, the court committed Joshua to the Walter P. Carter Center for treatment. In December, 1991, the court permitted Joshua to return to his mother's care. She had just completed a drug rehabilitation program. At some point in 1994, Joshua was transferred to the RICA school "because of severe hyperactivity, aggressive behavior and an inability to learn in a regular classroom."

Although DSS workers initially believed that Joshua's mother had overcome her dependence on drugs, they learned on September 14, 1994, that they were mistaken. A DSS worker arrived at the mother's home, at about 8:45 a.m., and found that Joshua, then age 7, and his 3–year–old brother had been left home alone overnight. Joshua reported that his mother had left the night before with a man. The house was in disarray. There was no food available for the children; dirty dishes and pans were in the sink; a bag of trash and empty beer bottles were on the floor; and a broken window, with

jagged pieces of glass, was within the children's reach. The mother had resumed her substance abuse and eventually told the DSS worker that she left the children unattended because her judgment had been impaired from alcohol and cocaine.

As a result of that episode, which was treated as a relapse, the court removed the children from the home and placed them in foster care. The court recommended that the mother enter long-term inpatient drug rehabilitation, which, it appears, she did. Weekly visitation was ordered, under the direction of DSS. The foster care and visitation arrangement was confirmed after review hearings in 1995, 1996, and 1997. In May, 1997, the court approved long-term foster care as the permanency plan and appointed a guardian for Joshua for educational and medical purposes. The guardianship apparently resulted from concern expressed by RICA that his mother was not giving Joshua his psychotropic medication during visits.

In January, 1998, following Joshua's admission to University of Maryland Hospital due to his acting in an "unsafe manner," the court placed the child in a group home.[1] Visitation under the direction of DSS was continued. In May, 1998, a RICA status report noted that "[a] decision was made to stop overnight weekend visits because [the mother] was not giving medications as prescribed and not scheduling visits in a predictable manner." RICA recommended that Joshua continue in long-term foster care "and continue to have visits with his mother as deemed appropriate by circumstances in the household and with input from [the mother] and Joshua." The court continued to allow visitation "under the direction of [DSS]."

---

1. In a status report prepared in May, 1998, RICA recounted an escalation of aggressive and inappropriate behavior, culminating in an incident when Joshua climbed out of a second story window in his foster home, ran into the street, and was nearly hit by a truck. He was also involved in two shoplifting incidents that day. The report noted that Joshua "expressed suicidal and homicidal thoughts and demonstrated incoherent thinking which [led] to a hospitalization at the University of Maryland from October 20, 1997 through November 5, 1997."

In October, 1998, the court reaffirmed that arrangement but added to its order a statement that "[m]other and the department are encouraged to work together regarding overnight visits." In a status report prepared in January, 1999, the group home noted that Joshua had recently been allowed to have overnight weekend visits with his mother—an expansion from the 3–hour Saturday visits he previously had. Joshua's therapist at RICA noted a problem with the increased visits, however, stemming from Joshua's desire to return home. A status report prepared by the RICA therapist stated that "for Joshua increased contact with his mother seems to undermine his progress and success. Each time [the mother] pushes for reunification Joshua's progress gets disrupted and he becomes negative about his need for RICA or his medication." The therapist concluded that "[t]here is no doubt that Joshua is attached to his mother and family and needs to remain in contact with them, but the frequency and duration of his contact will need continual monitoring to protect his needs." She advised that "[r]egular, predictable weekend afternoon visits and a once a month overnight can be supported unless this schedule proves too disruptive for Joshua's success." DSS commended the mother for her continuing recovery from drug addiction and for maintaining employment. It noted that there had been two weekend visits that went well and that, being drug-free, the mother wanted Joshua returned. DSS reported, however, that it was the consensus of the treatment team that continued residence at the group home was necessary in order not to jeopardize the gains Joshua made during the year.

These reports were considered at a review hearing in January, 1999. At the hearing, appellant expressed dissatisfaction with the recommendation that Joshua's overnight visits be limited to once a month. She stated, through counsel, that she had made progress working towards reunification with her son and that, in his recent overnight visits, she provided him with his medication and "no unusual incidents were reported." Appellant told the court that "she's frustrated by the fact that all of this progress has been made and the recommendations

are to distance her from her son despite the progress." At that point, the court informed appellant that, contrary to her perception, it did not view the recommendations as restrictive. Nevertheless, for the first time, appellant voiced concern about leaving visits subject to the direction of the Department because "under the direction leads to all kinds of restrictions that aren't discussed during the status, during the review hearing and occur without any input from the client making significant changes." She objected "to just leaving it all up to the Department not even knowing what the Department would plan to do and just come in on ... a review at my request and who knows how many months that would be down the road."

While the court agreed with appellant that greater visitation should occur, it was reluctant to set a specific schedule. It urged DSS to "go along with a little bit more visitation and see if the end result produces anything negative in [Joshua] and if it does then scale it back," but it noted "[t]hat's why I don't want to be ordering specific amounts of visitation. Because there's a dynamic that happens in every case that I just can't be there to observe and react to. And if I have a structured kind of visitation we can't adapt." With that, the court continued the existing arrangement, including the condition that visitation be under the direction of DSS. Joshua's mother appealed from that order. As in Justin's case, a new order, similar in character, was entered in July, 1999, following a scheduled review hearing.

## DISCUSSION

As noted, appellants treat the court's orders as a complete denial of visitation, except as determined by DSS, which, they aver, amounts to an unlawful delegation of judicial authority, not only to an executive agency, but to a party in the case. They have not complained in this appeal, specifically, that the court did not grant them the extended unsupervised visitation that they requested, so we shall not consider the merits of that issue; their complaint, rather, is that the court failed to decide that issue but left it to the unfettered discretion of DSS.

 The State, preliminarily, contends that appellants have waived their right to complain about the respective orders by failing to appeal either from the several previous orders containing the same broad language or from subsequent orders, entered in July, 1999 following another review hearing, which also contained that language. We find no basis for a waiver—on a theory of acquiescence—from the failure to challenge the earlier orders. The circumstances under which those orders were entered, though similar in many respects to those underlying the orders appealed from, were not identical; the children are older and the separation has been longer. Acquiescence in a limited visitation at one point does not, of itself, constitute acquiescence in a limited visitation at another point.

 The subsequent orders present a different, and more troublesome, issue. Notwithstanding appellants' assertion to the contrary at oral argument, we do not have some sort of inherent authority to vacate separate, independent orders or judgments from which no appeal has been taken. Appeals could have been filed from the later orders, which would have brought their validity before us. In the absence of such appeals, there is really no effective relief that we can grant with respect to the orders that *are* before us. They have been superseded and are no longer in effect; vacating them will provide no relief whatever to appellants. The appeals are clearly moot and, ordinarily, would be dismissed on that ground.

 It is clear from the record, however, and the parties have agreed, that it is common practice for the juvenile court in Montgomery County to enter orders of this kind, so the issue presented by appellants is a recurring and important one. With periodic six-month reviews, orders of this kind that are appealed will almost always be replaced by subsequent orders before this Court will have the opportunity to review them. We have recognized a very limited exception to the mootness doctrine in this kind of situation and have held that

"if the public interest clearly will be hurt if the question is not immediately decided, if the matter involved is likely to recur frequently, and its recurrence will involve a relationship between government and its citizens, or a duty of government, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision, then the Court may find justification for deciding the issues raised by a question which has become moot, particularly if all these factors concur with sufficient weight."

*Lloyd v. Board of Supervisors of Elections of Baltimore County,* 206 Md. 36, 43, 111 A.2d 379, 382 (1954).

We have applied that exception very sparingly (*see In re Riddlemoser,* 317 Md. 496, 564 A.2d 812 (1989); *Reyes v. Prince George's County,* 281 Md. 279, 380 A.2d 12 (1977); *Mercy Hosp. v. Jackson,* 306 Md. 556, 510 A.2d 562 (1986)), but this is a case in which we find it appropriate to do so.

■ As we indicated initially, the orders, on their face and without any reference to the colloquy between the court and counsel that led to them, could be read as a comprehensive authority for DSS to determine whether there was to be visitation and, if so, when, where, and how it was to occur. As we have also indicated, however, that was not what was intended and that is not how the orders are being implemented. Under the very language that appellants now complain of, they have, in fact, enjoyed visitation with their respective children, on a regular basis. Because it is the written order that constitutes the judgment of the court, however, the order itself must be clear and must express the court's decision. In *Rohrbeck v. Rohrbeck,* 318 Md. 28, 46 n. 7, 566 A.2d 767, 776 n. 7 (1989), we noted that "[t]he extemporaneous recitation of multiple or complex rulings from the bench may be fine for letting the parties and their attorneys know what the court's decision is in the case, but as it is the actual judgment that will govern the conduct, fortunes, and affairs of the parties, the court must be especially careful that the judgment itself is clear, complete, and precise." *See also In Interest of Teela*

*H.,* 3 Neb.App. 604, 529 N.W.2d 134 (1995). The orders before us do not have that quality.

At oral argument, the State essentially conceded that the orders were facially deficient and needed to include more detail. It urged, however, that what the court intended, and effectively did, was to deny the respective requests for unsupervised overnight visitation and continue the existing visitation arrangements subject to an expansion of visitation either upon agreement of the parties or upon further order of the court. Taking into account the court's comments, the State contends that the court properly exercised its authority and discretion and did not delegate any judicial authority to DSS. For the guidance of the court, we shall address the question of how far the court can go in allowing DSS to control the nature and extent of visitation.

Citing *Shapiro v. Shapiro, supra,* 54 Md.App. at 477, 458 A.2d at 1257, and a number of out-of-state cases, appellants begin, and essentially end, their argument with the unchallenged notions that a court may not delegate judicial authority to a non-judicial agency or person and that the vesting of "complete discretion in decisions regarding visitation to the custodial parent" amounts to an improper delegation. *Shapiro* makes those points well. It was a divorce case that included a particularly nasty custody battle. The child, around 11 years old at the time, had developed an intense antipathy toward his father and had informed the court that he did not want even to see him, must less to visit. The child was in psychotherapy with a Dr. Lehman, who had recommended therapy for the parents as well. In its judgment, the court ordered that the father would have *no* visitation with the child until such time that Dr. Lehman recommended it and, even then, the visitation would be on the terms, guidelines, and places recommended by the doctor.

The Court of Special Appeals found two problems with that order. First, it constituted a complete suspension of all visitation privileges, which should be ordered only in the exceptional case. The appellate court did not find *Shapiro* to

be that kind of exceptional case. Second, and more to the point here, the court noted that jurisdiction over custody and visitation was vested in the equity courts and that "[t]here is no authority for the delegation of any portion of such jurisdiction to someone outside the court." *Id.* at 484, 458 A.2d at 1262. The court is entitled to rely on expert opinion in making a decision, but the decision must be that of the court, not the expert. The appellate court's ultimate conclusion was that "absent some circumstances not evident in the record before us, provision for limited, structured visitation should be made and, if deemed necessary, that visitation be under supervision of a therapist or someone else designated by the chancellor," and that any order for visitation "would necessarily contemplate periodic modification as circumstances warrant or require." *Id.* at 485, 458 A.2d at 1262 (footnote omitted).

*Shapiro* sets the proper framework. *See,* to the same effect, *Hamel v. Hamel,* 489 A.2d 471 (D.C.1985) (not improper to require mother to meet with court-appointed psychiatrist so that trial court could receive recommendation for appropriate visitation schedule); *Lewis v. Lewis,* 637 A.2d 70 (D.C. 1994) (improper to delegate full discretion over whether and when visitation is to occur to custodial parent); *Jones v. Jones,* 326 Ark. 481, 931 S.W.2d 767 (1996) (improper to authorize therapist, on her own, to modify court-ordered visitation if therapist found it detrimental to child). Subject to the preclusion of that kind of delegation of authority, there is a great deal of flexibility permitted in visitation orders. They run a gamut—a proper gamut. In the divorce, or post-divorce, setting, they may simply provide for "reasonable," but otherwise unspecified, visitation, or they may set out a rather detailed schedule with respect to times, places, and conditions, or they may be somewhere between those poles, depending on the circumstances and the ability of the parties to agree to a mutually acceptable arrangement. *See Leary v. Leary,* 97 Md.App. 26, 54–55, 627 A.2d 30, 43–44 (1993).

In those settings, absent some evidence of past or potential abuse or neglect, there is usually no real concern about the child's safety; the determination of custody and visitation, if

not agreed to by the parties, arises from an application of the general "best interest of the child" standard to the situation at hand. Absent some express provision in the order to the contrary, the parties are usually free to depart from the ordained visitation schedule, even if it is detailed and specific, if they find it mutually convenient to do so, without seeking a modification of the order. Indeed, as the children grow older and circumstances change, it is not uncommon for the parents to make their own adjustments without further court involvement. The court is ordinarily happy to defer to the agreement of the parties; it exercises its equity jurisdiction and makes the determination only when the parties are unable or unwilling to do so, and it enforces that determination only when one party, in the absence of an agreement and over the objection of the other, acts in derogation of it. In that traditional setting, the court is essentially deciding a case— resolving a dispute within its jurisdiction—not acting in any specific way as a guardian or protector of the child; the order itself lasts indefinitely—until the child is emancipated or reaches majority or until, on someone's petition, it is modified.

When there is evidence that the child has been abused or neglected, or is in some danger of abuse or neglect, however, the court's role is necessarily more pro-active. Together with other agencies, it does then have a greater responsibility to assure the child's safety and well-being and is not concerned merely with deciding a dispute between the parties. *See, for example,* Maryland Code, § 9–101 of the Family Law Article, precluding the court from awarding custody or visitation to a person who has a history of abuse unless the court makes an affirmative finding that further abuse is not likely. That is especially the case when the custody or visitation issue arises in the context of a CINA proceeding. The court there is dealing with a child who already has been found to need the assistance of the court because (1) the child is mentally handicapped or is not receiving ordinary and proper care and attention, or (2) the child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's problems. *See* Md.Code, § 3–801(e) of

the Cts. & Jud. Proc. Article, defining a child in need of assistance. The court, in such a setting, is obliged, among other things, to "provide for the care, protection, and wholesome mental and physical development" of the child and to hold the parents responsible "for remedying the circumstances that required the court's intervention." § 3–802(a)(3) and (4). If the child has been removed from the home, it is only because the court found the removal "necessary for his welfare or in the interest of public safety." § 3–802(a)(5).

It is evident that, in a CINA case, where the child has been removed from the home under the standards just noted, the parents and DSS do not stand in the same parity as parents ordinarily do *vis a vis* each other in the divorce or post-divorce setting. The court is authorized to commit the child to the custody or guardianship of DSS "on terms that the court considers appropriate to meet the priorities set forth in § 3–802." § 3–820(c)(ii). Although it has its own statutory mission, DSS acts, in many respects, as the court's agent in attempting to remedy the problems that led to the CINA finding and removal of the child in the first instance. Unlike in the normal divorce setting, the court has a clear and continuous supervisory role to play. It is usually dealing with a more volatile situation—a child at risk, a troubled child with special needs—that requires much closer monitoring than does a routine custody dispute between two parents. DSS (or the other chosen guardian or custodian) is held to a greater and more direct level of accountability to the court, and it needs to be given sufficient authority and flexibility to carry out its function.

Even in this setting, however, the court may not delegate its responsibility to determine the minimal level of appropriate contact between the child and his or her parent or other guardian, and, except to respond to a true and immediate emergency, it may not permit DSS to curtail, or make more onerous, the visitation allowed in the court order. *See In Interest of Teela H., supra*, 3 Neb.App. at 604, 529 N.W.2d at 134; *In Re Donnovan J.*, 58 Cal.App.4th 1474, 68 Cal.

Rptr.2d 714 (1997). It must determine, and set forth in its order, at least the minimal amount of visitation that is appropriate and that DSS must provide, as well as any basic conditions that it believes, as a minimum, should be imposed. Beyond that, it is not inappropriate for the court to permit DSS, with the concurrence of the parent, to determine whether *additional* visitation or *less* restrictive conditions on visitation are in order. Understanding that it likely will not have an opportunity to review the matter for at least six months and that, with ongoing efforts to deal with the conditions that led to the removal of the child circumstances may change during that period, the court may properly leave to DSS the ability to afford a parent *greater* or less restrictive access than the order directs.

The record in these two cases demonstrates that this is what the court intended to do. The only error is that the court's intention was not properly reflected in its orders.

ORDERS ENTERED JANUARY 19, 1999, VACATED; MONTGOMERY COUNTY TO PAY THE COSTS.