906 A.2d 898

In re KARL H. and Anthony H.

No. 92, Sept. Term, 2005.

Court of Appeals of Maryland.

Sept. 6, 2006.

**404**

Martha Weisheit, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for petitioners.

Seri A. Wilpone (Legal Aid Bureau, Inc., on brief) C.J. Messerschmidt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

In *In re Damon M.*, 362 Md. 429, 438, 765 A.2d 624, 628 (2001), this Court held that, if a permanency plan for reunification is amended or modified to a permanency plan for adoption, long-term care, or permanent foster care, it is an immediately appealable order. The question now before this Court is, if at the initial "permanency planning hearing,"[1] the trial court ordered a concurrent permanency plan which provided

---

1. A court holds an initial "permanency planning hearing" to determine long term placement plans for a child in need of assistance ("CINA"). After the initial hearing, there are typically six-month review hearings for updates and amendments to the original permanency plan. Md. Code (1974, 2002 Repl.Vol.), § 3–823(b) and (h) of the Courts and Judicial Proceedings Article.

for the pursuit of both reunification and adoption, whether that order establishing the permanency plan is immediately appealable.[2] We hold that a concurrent permanency plan ordered at the time of the permanency planning hearing and which provides for both reunification and adoption is an appealable interlocutory order.[3]

In March 2004, brothers, Karl H. Jr. and Anthony H. were placed in the temporary care and custody of the Charles County Department of Social Services (CCDSS) for shelter care placement. On May 7, 2004, Karl H., Sr. ("Petitioner") and his wife, Lisa H., the parents of Karl H. Jr. and Anthony H., consented to a finding that their sons were CINA.[4] On December 10, 2004, the Circuit Court for Charles County

---

**2.** The term "[a]doption" means the legal proceeding:

(a) By which an individual becomes the child of an adoptive family; and

(b) Which confers on the adopted child all the legal rights and privileges to which a child born to that family would be entitled. COMAR 07.02.11.03(B)(4). Additionally, "adoption" is defined as

[t]he creation of a parent-child relationship by judicial order between two [usually unrelated] parties.... This relationship is brought about only after a determination that ... the parents' parental rights have been terminated by court order. Adoption creates a parent-child relationship between the adopted child and the adoptive parents with all the rights, privileges, and responsibilities that attach to that relationship[.]

BLACK'S LAW DICTIONARY 52 (8th ed.2004).

**3.** Interlocutory is defined as, *inter alia*, "Provisional; interim; temporary; not final. Something intervening between the commencement and the end of a suit which decides some point or matter, but is not a final decision of the whole controversy." BLACK'S LAW DICTIONARY 815 (6th ed.1991).

**4.** A "child in need of assistance" ("CINA") means a child who requires court intervention because:

(1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and

(2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

Md.Code (1974, 2002 Repl.Vol.), § 3–801(f) of the Courts and Judicial Proceedings Article. *See* § 3–801(g) of the Courts and Judicial Proceedings Article.

approved concurrent permanency plans for adoption by a non-relative or reunification with Karl H., Sr. and Lisa H.[5] In January 2005, each parent separately filed a timely appeal to the Court of Special Appeals on the grounds that the juvenile court abused it discretion, under the circumstances, in adopting the plans of reunification concurrent with adoption. The Court of Special Appeals held that the orders establishing concurrent permanency plans of reunification and adoption were neither final judgments nor appealable interlocutory orders and dismissed the appeal. *In re Karl H. and Anthony H.*, 163 Md.App. 536, 540–41, 881 A.2d 1174, 1177 (2005).[6] Petitioner filed a petition for a writ of certiorari in this Court, which we granted. *In re Karl H.*, 390 Md. 90, 887 A.2d 655 (2005).[7] The issue we must decide is whether the Court of Special Appeals erred in holding that a concurrent permanency plan that includes adoption is not an appealable interlocutory order. We vacate the judgment of the Court of Special Appeals and remand the case to that court for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

We adopt the facts as summarized by the Court of Special Appeals:

> Karl Jr., [born in 1998], and his brother, Anthony, [born in 1999], are the children of [Petitioner] and [his wife,] Lisa H. The [Petitioner and his] family came to the attention of the Charles County Department of Social Services

---

5. *See infra* note 13.

6. The parties in that appeal were: 1) Mr. Karl H., Sr., Petitioner and natural father to both Karl and Anthony; 2) Respondent in this case, Charles County Department of Social Services ("CCDSS"); and, 3) Respondent in this case, Legal Aid Bureau, Inc., attorney representing the children. Although Mr. and Mrs. H. noted separate appeals to the Court of Special Appeals, "all appeals [were] consolidated before [that] [c]ourt." *Id.* at 540 n. 1, 881 A.2d at 1176 n. 1.

7. Both parents appealed the Circuit Court's judgment to the Court of Special Appeals, whereas only the father filed a petition for writ of certiorari in this Court.

("CCDSS") on March 5, 2004, when the boys were five and three, respectively, because the [family] ... w[as] homeless and living [in] ... their vehicle. The CCDSS caseworker assigned to the family[,] enabled them to use the agency's shower and laundry at that time. After the family moved into [a] ... [m]otel, CCDSS paid their back rent and provided vouchers for an additional week's rent.

On March 25, 2004, a family friend reported to CCDSS that Mrs. H. had dropped the boys off at her home the preceding day, but had failed to return for them. That day, the family's caseworker spoke with Mrs. H., who explained that she had separated from [Petitioner], and had obtained a protective order against him, which prohibited contact between him and either herself or the boys. Mrs. H. stated that she could not care for the boys at that time.

[Petitioner] met with the caseworker the next day and confirmed the existence of the protective order. He also informed the caseworker that in the past he had been convicted of ... domestic violence against Ms. H [and previously served time in prison on a murder conviction]. [Petitioner] admitted to a history of substance abuse and [stated] ... that he had relapsed, having used crack cocaine the previous evening.

The boys were ... placed in emergency shelter care, and the Circuit Court for Charles County, sitting as a juvenile court, continued shelter care on March 29, 2004.[8] The juvenile court ordered [Petitioner] and Mrs. H. to participate in psychological and substance abuse evaluations, and to follow up with any treatment recommendations. [Petitioner] subsequently made an appointment to register for

---

8. Emergency shelter care means that, "[a] local department may place a child in emergency shelter care before a hearing if: (1)[p]lacement is required to protect the child from serious immediate danger[.]" Md. Code (1974, 2002 Repl.Vol.), § 3–815(b)(1) of the Courts and Judicial Proceedings Article.

A shelter care hearing "means a hearing held before disposition to determine whether the temporary placement of the child outside of the home is warranted." Section 3–801(x) of the Courts and Judicial Proceedings Article.

substance abuse treatment, but he did not arrive at the appointed time.

Adjudicatory and disposition hearings were held on May 7, 2004, during which [Petitioner] and Mrs. H. consented to a finding that the boys were CINA. The juvenile court again ordered both parents to participate in substance abuse and mental health evaluations, including an assessment of both parents' mental capacity to care for their children, and to follow up with any treatment recommendations. In addition, the juvenile court ordered that [Petitioner] and Mrs. H. submit weekly to urinalys[i]s.

Over the next six months, [Petitioner] and Mrs. H. failed to make significant progress toward addressing their substance abuse and mental health issues. In November 2004, however, [Petitioner] and Mrs. H. enrolled in an eighteen-month Crisis Watch and Counseling program at the New Life Advocacy Council, which provided substance abuse counseling and parenting skills training.

[Both parents also had scheduled weekly supervised visits with the children, in which Petitioner visited the children regularly. Mrs. H's visits, however, were sporadic.]

On December 10, 2004, the juvenile court conducted an initial permanency planning hearing for both boys. At the time of the hearing, the boys remained in the foster home in which they had been placed in March, and appeared to have adjusted well, having made friends in the community and at school. The juvenile court concluded that [Petitioner] and Mrs. H. were not yet able to care for their children at that time, as they still had "serious issues of their own" that had yet to be addressed. Accordingly, the juvenile court ordered a concurrent plan of reunification and adoption for the boys.

*In re Karl H.*, 163 Md.App. at 539–40, 881 A.2d at 1175–76 (alterations added).

At the December 10, 2004, permanency plan hearing the trial judge concluded:

I find that continued placement is certainly necessary and appropriate. I do find that the parents at this time are not able to care for the children. They have serious issues of their own that they must address.... I hope that they ... can get their lives straight.

\* \* \* \* \* \*

I don't believe ... the children can wait, I'm going to order the plan be adoption but it's also going to be concurrent with reunification because I want the parents to be afforded all the services for reunification. I want that, basically we're going to ... it's going to be a race, to both concurrent plan. [sic] And I want the parents to work toward reunification.

\* \* \* \* \* \*

[W]e will schedule this matter for review on June the 17th of 2005 or earlier if another issue needs to be addressed sooner. And unless the petition for guardianship is granted.

Two identical permanency plans were adopted as a result of the December 10, 2004 hearing, one pertained to Karl Jr. and the other to Anthony. In the plans, the court found that:

[t]he [r]espondent's permanency plan is [r]eunification with his parents[,] concurrent with [a]doption, because the following compelling reasons exist making return home not in the [r]espondent's best interests: Mr. and Mrs. H have not completed the court ordered recommendations.

\* \* \* \* \* \*

ORDERED, that the permanency plan is a concurrent plan of [a]doption and [r]eunification with his parents; and it is further

\* \* \* \* \* \*

ORDERED, that a petition for termination of parental rights be filed within 30 days; [9] and it is further

---

9. In Anthony H.'s permanency plan, after the words "30 days," a line directs the reader to several handwritten words which state "of the date of this order" located below the typewritten words.

ORDERED, that this matter shall be set for a permanency plan review hearing on June 17, 2005, at 9:30 a.m.....

At the permanency plan hearing the court ordered the CCDSS to file a termination of parental rights ("TPR") petition within 30 days after the hearing. The department did not file the petition until April 5, 2005, almost four months after the December 10, 2004, court hearing. *See Id.* at 544 n. 6, 881 A.2d at 1179 n. 6.

## Mootness

■ In April 2006, in a joint motion, both Respondents requested that this Court dismiss Petitioner's appeal as moot. In March 2006, prior to oral argument in this Court in the present case, the Circuit Court terminated Petitioner's parental rights as a result of a judgment for guardianship with right to consent to adoption and/or long term care. Petitioner appealed the termination of parental rights. As of the filing of this opinion, an appeal of that order is pending in the Court of Special Appeals.[10] Respondents argue that there is no longer an existing controversy and it would not be appropriate to resolve the issue presented; therefore, the petition should be dismissed. Conversely, Petitioner contends that, even if moot, the issue would easily evade appellate review, would likely recur, and this Court has the discretion to review moot cases that involve questions of public importance.

We have previously stated that, "[g]enerally, appellate courts do not decide ... moot questions. A question is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide." *Att'y Gen. v. Anne Arundel County Sch. Bus Contractors Ass'n, Inc.,* 286 Md. 324, 327, 407 A.2d 749, 752 (1979)

This Court was confronted with a similar issue in another child in need of assistance ("CINA") case, *In re Justin D.,* 357

10. The appeal was noted in the intermediate appellate court, on April 5, 2006, case number 00348 (Sept. Term, 2006).

Md. 431, 444–45, 745 A.2d 408, 415–16 (2000). That case involved the validity of orders that appeared to give the Department of Social Services ("DSS") unfettered discretion to determine the child's visitation schedule. We recognized, in that case, that "[w]ith periodic six-month reviews, orders of this kind that are appealed . . . [could] be replaced by subsequent orders before this Court w[ould] have the opportunity to review them." *Id.* at 444, 745 A.2d at 415. Although we rarely review moot issues of law, under circumstances such as this, where an issue may perpetually evade review, we are inclined to review moot questions of law:

> " '[I]f the public interest clearly will be hurt if the question is not immediately decided, if the matter involved is likely to recur frequently, and its recurrence will involve a relationship between government and its citizens, or a duty of government, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision, then the Court may find justification for deciding the issues raised by a question which has become moot, particularly if all these factors concur with sufficient weight.' "

*Id.* at 444–45, 745 A.2d at 416 (quoting *Lloyd v. Bd. of Supervisors of Elections of Baltimore County,* 206 Md. 36, 43, 111 A.2d 379, 382 (1954)).

In the present case, because the order would subsequently be replaced by another order and evade review and the appeal of the termination of parental rights is pending in the Court of Special Appeals, we will review the issue raised in this case.

### Standard of Review

The question of whether a concurrent permanency plan order which provides for both adoption and reunification is an appealable interlocutory order is an issue of law, which we will review *de novo.* *See Walter v. Gunter,* 367 Md. 386, 391–92, 788 A.2d 609, 612 (2002) ("[W]here the order involves an interpretation and application of Maryland statutory and case law, [we] must determine whether the lower court's conclusions are 'legally correct' under a *de novo* standard of re-

view.") (citation omitted); *Register of Wills for Baltimore County v. Arrowsmith,* 365 Md. 237, 249, 778 A.2d 364, 371 (2001) ("[A]s is consistent with our review for all questions of law, we review the order and judgment *de novo.*") (citation omitted).

## II. ANALYSIS

■ Petitioner argues that the Court of Special Appeals erred when it held that Petitioner would not be detrimentally affected by the trial judge's concurrent permanency plan orders because reunification efforts were not terminated. Petitioner asserts that even if reunification efforts were continued during the pendency of the proceedings, the order required the filing of a termination of parental rights petition within thirty days (sixty days if the local department does not support the plan of adoption), which could lead to Petitioner's loss of custody. Petitioner contends that the concurrent plan of reunification and adoption was detrimental to him, depriving him of the expectation or hope of reunification; therefore, adoption of the plan was an appealable interlocutory order.

Further, Petitioner maintains that although the Court of Special Appeals based its holding on *In re Billy W.,* 386 Md. 675, 874 A.2d 423 (2005), that case is distinguishable from Petitioner's case. According to Petitioner, in the *In re Billy W.,* case, *infra,* the mother appealed because the trial court "fail[ed] to revise the permanency plan and return the child to her custody[;]" however, in Petitioner's case, he argues, that the terms of the permanency plan did not benefit him, quite the opposite, the terms were detrimental to him and deprived him of his rights to raise his own children.

Respondent, CCDSS, contends that the permanency plan did not adversely affect the Petitioner's custody rights. CCDSS asserts that a concurrent plan provides hope to a parent that he or she may regain custody, whereas, any expectation of reunification is extinguished with a reunification plan that is amended to a singular plan of adoption. Addition-

ally, CCDSS argues that since the initial plan (established by the court at the time of the permanency plan hearing) was a concurrent plan, the permanency plan order could not then effect any "change" in the permanency plan as required by *In re Damon M., supra.* Additionally, Respondents assert that the circuit court can rescind the permanency plan at any time before the TPR petition is granted.

Respondent, Legal Aid Bureau, Inc., attorney for the children, argues that the trial court in its concurrent plan set forth a periodic review hearing approximately six months from the date of the permanency plan hearing. Therefore, Petitioner's argument that any expectation of regaining custody of his sons was illusory. *See* § 3–823(h) of the Courts and Judicial Proceedings Article. Respondent contends that CCDSS is permitted to make efforts toward concurrent goals and concurrent planning achieves the statutory objectives. *See* Md. Code (1999, 2004 Repl.Vol.), § 5–525(d)(1)–(3) of the Family Law Article.

The Court of Special Appeals held that a concurrent permanency plan of reunification and adoption ordered at the time of the permanency plan hearing, was not an appealable interlocutory order, because it did not "operate to either deprive [a parent or parents] of the care and custody of [their] children or change the terms of . . . care and custody of the children to [the parent's or parents's] detriment." *In re Karl H.,* 163 Md.App. at 543, 881 A.2d at 1178 (quoting *In re Billy W.,* 386 Md. at 691–92, 874 A.2d at 423) (alterations added). The Court of Special Appeals reasoned:

We are persuaded that this case is analogous to *In re Billy W.,* because the orders adopting a concurrent permanency plan of reunification and adoption here did not detrimentally affect [Petitioner's] . . . custody rights. Like the mother's rights in *In re Billy W.,* [Petitioner's] . . . custody rights were abrogated when Karl, Jr. and Anthony were adjudicated CINA and committed to CCDSS's custody, but not when the juvenile court adopted the concurrent permanency

plans.[11]

\*　　\*　　\*　　\*　　\*　　\*

After the court ordered concurrent plans of reunification and adoption, CCDSS was required to file guardianship petitions for both Karl, Jr. and Anthony, pursuant to CJP section 3–823(g)(1).

\*　　\*　　\*　　\*　　\*　　\*

Practically, this "dual-track" planning makes sense. If future events and circumstances demonstrate that adoption, and not reunification, is in the best interests of Karl, Jr. and Anthony, the earlier steps taken by CCDSS should hasten the goal of achieving a positive and stable home for the children.

*In re Karl H.*, 163 Md.App. at 543–45, 881 A.2d at 1178–79 (citations omitted) (footnotes omitted) (alterations added).

### A Parent's Fundamental Right

■ Parents have a fundamental and constitutional right to raise their children. *See In re Samone H. & Marchay E.*, 385 Md. 282, 299–301, 869 A.2d 370, 380–81 (2005) (and cases cited therein). We acknowledge that "Maryland has . . . echoed the Supreme Court, declaring a parent's liberty interest in raising a child a fundamental one that cannot be taken away unless clearly justified." *In re Yve S.*, 373 Md. 551, 567, 819 A.2d 1030, 1039 (2003) (citations omitted).

---

11. The Court of Special Appeals stated that Petitioner's rights were "abrogated" when the court granted CCDSS custody of the children. Although a declaration of CINA may result in the child being committed to the care of the State or the State can take temporary custody of a child, the State is still under an obligation to "provide the parents or legal guardian with services reasonably designed to facilitate reunification, unless contrary to the child's best interest." COMAR 07.02.11.05(C)(3). A parent's rights are not terminated until the State proves by clear and convincing evidence that termination of a parent's rights is in the best interest of the child, which ordinarily occurs at adoption, long-term care, or permanent foster care proceedings. *See* Md.Code (1999, 2004 Repl.Vol.), §§ 5–312 and 5–313 of the Family Law Article.

The Court has recognized the fundamental rights which parents possess:

> The United States Supreme Court has long recognized that a parent has a constitutionally protected fundamental right to raise his or her children. Recently, ... we iterated this principle and stated that a parent's interest "occupies a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility. '[F'ar] more precious ... than property rights,' parental rights have been deemed to be among those 'essential to the orderly pursuit of happiness by free men....'"

\* \* \* \* \* \*

In *In re Mark M.*, we explained that a parent's fundamental right to make decisions concerning the care, custody, and control of his or her children is not absolute. We said:

> That fundamental interest, however, is not absolute and does not exclude other important considerations. Pursuant to the doctrine of *parens patriae*, the State of Maryland has an interest in caring for those, such as minors, who cannot care for themselves. We have held that "the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute." That which will best promote the child's welfare becomes particularly consequential where the interests of a child are in jeopardy, as is often the case in situations involving sexual, physical, or emotional abuse by a parent.

\* \* \*

> We have recognized that in cases where abuse or neglect is evidenced, particularly in a CINA case, the court's role is necessarily more pro-active. *See In re Justin D.*, [357 Md. 431, 448, 745 A.2d 408, 417 (2000)].

\* \* \*

> A trial court, acting under the State's *parens patriae* authority, is in the unique position to marshal the applicable facts, assess the situation, and determine the correct means of fulfilling a child's best interests.

[*In re Mark M.*, 365 Md. 687, 705–07, 782 A.2d 332, 343–44 (2001).]

*In re Samone H.*, 385 Md. at 299–301, 869 A.2d at 380–81 (alterations in original) (alterations added) (citations omitted).

We recently stated that " 'the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute.' " *In re Billy W.*, 386 Md. at 684, 874 A.2d at 429 (quoting *Boswell v. Boswell*, 352 Md. 204, 219, 721 A.2d 662, 669 (1998) (citations omitted)). A State's role in a child's care and protection should take on utmost importance, while a parent's right may not be absolute. A parent's rights may be diminished, "[w]hen there is a conflict between the rights of the parents or legal guardian and those of the child, the child's best interest shall take precedence." COMAR 07.02.11.07(A).

## Permanency Plan

When a child declared a CINA is removed from his or her home and placed in the temporary custody of the State, several steps must be taken to guarantee the child and his or her parents their due process rights. Md.Code (1974, 2004 Repl.Vol.), § 3–802 of the Courts and Judicial Proceedings Article. There must be an adjudicatory and disposition hearing to determine whether the child is a CINA. *See generally* Md.Code (1974, 2004 Repl.Vol.), § 3–819 of the Courts and Judicial Proceedings Article. If declared CINA, then several family services are implemented such as housing, visitation, mental and physical assessments, parental courses, psychological therapy, drug rehabilitation, and educational services for the family. *Id.* Within eleven months, a permanency plan hearing must be held which sets a course towards securing a long-term goal for the CINA.

The implementation of a

permanency plan is an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement. It provides the goal toward which the parties

and the court are committed to work. It sets the tone for the parties and the court and, indeed, may be outcome determinative. Services to be provided by the local social service department and commitments that must be made by the parents and children are determined by the permanency plan. And, because it may not be changed without the court first determining that it is in the child's best interest to do so, the permanency plan must be in the child's best interest. These are the reasons, no doubt, that the court is charged with determining the plan and with periodically reviewing it, evaluating all the while the extent to which [there is compliance].

*In re Damon M.*, 362 Md. at 436, 765 A.2d at 627–28 (alteration added).

A trial court has several alternatives when determining the long term goals for a CINA, such as, reunification with parents, living with or adoption by relatives, independent living, foster care, or adoption by non-relatives.[12] The court's goal should be, if possible, to reunite a child with its family. In situations, however, where reunification may not be possible, a permanency plan with either concurrent or single long-term placement goals may be considered:

(d)(1) ... [R]easonable efforts shall be made to preserve and reunify families:

(i) prior to the placement of a child in an out-of-home placement, to prevent or eliminate the need for removing the child from the child's home; and

---

**12.** (b) In establishing the out-of-home placement program the Administration shall:

 (1) provide time-limited family reunification services to a child placed in an out-of-home placement and to the parents or guardian of the child, in order to facilitate the child's safe and appropriate reunification within a timely manner; and

 (2) concurrently develop and implement a permanency plan that is in the best interests of the child.

Maryland Code (1999, 2004 Repl.Vol.), § 5–525(b) of the Family Law Article.

(ii) to make it possible for a child to safely return to the child's home.

(2) In determining the reasonable efforts to be made and in making the reasonable efforts described under paragraph (1) of this subsection, the child's safety and health shall be the primary concern.

(3) Reasonable efforts to place a child for adoption or with a legal guardian may be made concurrently with the reasonable efforts described under paragraph (1) of this subsection.

(4) If continuation of reasonable efforts to reunify the child with the child's parents or guardian is determined to be inconsistent with the permanency plan for the child, reasonable efforts shall be made to place the child in a timely manner in accordance with the permanency plan and to complete the steps to finalize the permanent placement of the child.

Section 5–525(d)(1)–(4) of the Family Law Article.

### Concurrent Permanency Plan

The county DSS may consider implementation of a concurrent permanency plan, which authorizes a trial judge to expedite the adoption process for a child awaiting a permanent home.[13] DSS is encouraged to execute a concurrent permanency plan that provides a variety of proposals that would secure a permanent and secure home for a CINA.[14]

---

13. The term "concurrent permanency planning" means "the process of taking concrete steps to implement both primary and secondary permanency plans, for example, by providing time-limited family reunification services while also exploring relatives as resources." COMAR 07.02.11.03(B)(11).

14. We find Judge Battaglia's summary of the recodification of § 3–823 instructive because it clearly outlines a trial court's obligations of how to implement and maintain a permanency plan:

In 1998, Maryland began to implement Congress's Adoption and Safe Families Act of 1997 ("Act"), a comprehensive plan,

In *In re Yve S.* [373 Md. at 577–81, 819 A.2d at 1046–48], quoting from *In re Damon M.*, we ... delineated the requirements a trial court must follow when implementing a permanency plan:

\* \* \* \* \* \*

Section 3–826.1 [now codified as Section 3–823 of the Courts and Judicial Proceedings Article] requires the court, not later than 11 months after a child found to be in need of assistance has been placed in foster care, *see also* Md.Code (1989, 1991 Repl.Vol., 1997 Cum. Supp.), § 501(m) of the Family Law Article, to hold a permanency planning hearing to determine the permanency plan for that child. § 3–826.1(a)(1) [now § 3–823(b)(1)]. At that hearing, for each child in placement and in determining the plan, the court is required to make certain decisions and findings, § 3–826.1(c), [now § 3–823(e)] specifically, whether the child should be: returned to the parent or guardian, § 3–826.1(c)(1)(i) [now § 3–823(e)(1)(i)]; placed with relatives to whom adoption or guardianship is granted, § 3–826.1(c)(1)(ii) [now § 3–823(e)(1)(ii)]; placed for adoption, § 3–826.1(c)(1)(iii) [now § 3–823(e)(1)(iii)]; [live independently], § 3–826.1(c)(1)(iv) [now § 3–823(e)(1)(vii)]; or because of the child's special needs or circumstances, continued in placement on a permanent or long-term basis or for a specified period. § 3–826.1(c)(1)(v) and (vi) [now § 3–823(e)(1)(v) and (vi)].

*Id.* at 577–81, 819 A.2d at 1046–48 (additions in original). We explained:

Section 3–826.1(f) [now § 3–823(h)] mandates periodic reviews of the permanency plan by the court. Subsection (f)(1)(i) provides [now § 3–823(h)(1)(i)] that such reviews will be "no less frequently than every six months until commitment is rescinded." If, however, at the permanency planning hearing or a subsequent review hearing, the court, inter alia, orders a child continued in permanent foster care, the court is no longer required to hold the review hearings at six month intervals. Subsection (f)(1)(ii) [now § 3–823(h)(1)(ii), is revised to require review hearings every 12 months.]. As is true of the initial permanency planning hearing, the court must make some determinations at the hearing to review the permanency plan. § 3–826.1(f)(2) [now § 3–823(h)(2)]. Among other things, in addition to determining whether the commitment remains necessary and appropriate, subsection (f)(2)(i) [now § 3–823(h)(2)(i)], and evaluating the progress made toward alleviating or mitigating the causes of the commitment, subsection (f)(2)(iii) [now § 3–823(h)(2)(iii)], the court is required to "determine the extent of compliance with the permanency plan," Subsection (f)(2)(ii) [now § 3–823(h)(2)(ii)], and to change it "if a change in the permanency plan would be in the child's best interest." Subsection (f)(2)(v) [now § 3–823(h)(2)(vi)].

*Id.* at 581, 819 A.2d at 1048 (additions in original).

*In re Billy W.*, 386 Md. at 687–88, 874 A.2d at 430–31 (alterations added).

enacted to facilitate adoption of children in foster care.[15] *See* Pub.L. No. 105–89, 111 Stat. 2115 (codified as amended at 42 U.S.C. § 1305 note, noting that reasonable efforts shall be made to preserve and reunify children with their families while concurrently advancing reasonable efforts toward placing a child for adoption). The State's failure to adopt the Act

---

**15.** Generally, the Act is designed to promote the adoption of children in foster care. To that end, the Act provides that a child's health and safety are paramount in determining whether reasonable efforts to preserve the family had been undertaken. In addition, the Act makes it easier to remove a child from abusive family and speed up the adoption process.

Specifically, as to the provision that pertains to concurrent permanency plans, the Act essentially shortens the period for reunification, because the "Act usher[s] in a requirement of concurrent planning under which the government must simultaneously provide parents assistance to reunify with their children and to prepare for permanent placement for dependent children should reunification fail." William Wesley Patton and Amy M. Pellman, *The Reality of Concurrent Planning: Juggling Multiple Family Plans Expeditiously Without Sufficient Resources*, 9 U.C. Davis J. Juv. L. & Pol'y, 171, 172 (2005) (footnote omitted).

In 1998, the Maryland General Assembly adopted the Act, by way of amended House Bill 1093 (H.B.1093), to comply with the federal law. *See* 1998 Md. Laws, Chap. 539 ("[T]o provide certain reunification services and concurrently develop and implement a certain permanency plan[.]"). The Legislature was aware that enactment of

[t]he bill could result in more court decisions to terminate parental rights and a more expedient TPR process, thereby allowing children to spend less time in foster care and be adopted more rapidly.

\* \* \* \* \* \*

In addition, the bill's provision for time-limited reunification efforts would limit provision[s] of reunification services to 15 months under specified circumstances, resulting in an indeterminate but significant amount of savings.

\* \* \* \* \* \*

The Circuit Court [for] Baltimore City, which handles approximately 60% of the State's CINA and TPR cases, advises that the bill's provisions could increase TPR hearings by an estimated 50%, or 447 hearings annually, and the number of CINA cases (to petition the court to waive reasonable reunification efforts) by 300 annually. Department of Legislative Services, Fiscal Note, H.B. 1093 at 5,6 (1998). The Legislative Floor Report indicates that, "[t]he bill also establishes that reasonable efforts to place a child for adoption or with a legal guardian may be made concurrently with the reasonable efforts to reunify the family." Department of Legislative Services, Floor Report, H.B. 1093 at 1 (1998).

would have resulted in the loss of federal funding. As anticipated, implementation of the Act resulted in fiscal incentives.[16] The purpose of the Act was to streamline the foster care placement process and provide permanent homes for children in foster care, by expediting permanency planning hearings and TPR proceedings. Patton, *supra* note 15, at 174. Further, the presumption of the Act is that if reunification efforts fail the preferred result is adoption. *Id.*

When the Maryland Legislature adopted the federal Act there was no discussion of whether expediting the termination of a parent's rights would be in the best interest of a child. The main focus of the Act was to accelerate the placement of foster children in adoptive homes. The relative pros and cons of concurrent permanency planning were neither discussed nor analyzed before the Act was adopted by the Legislature. The passage of the bill amended several sections of the Family Law Article, including § 5–525(b), which states that DSS shall establish a goal that facilitates reunification while concurrently generating and executing a concurrent permanency plan.

Commentators, Patton and Pellman, have criticized concurrent permanency planning on the grounds that it

> is severally flawed for a number of reasons. First, one may question whether termination of parental rights was required in a significant number of cases because: (1) the expedited decision to terminate parental rights is often made in six months, and sometimes without the necessity of providing family rehabilitation and reunification; (2) necessary social services are often not readily available so while the termination clock ticks away, little reunification is possi-

---

**16.** As an incentive, the federal government, under the Act

provided adoption subsidies of up to $6,000.00 per adopted child to assist states in increasing the percentage of out-of-home children who achieve permanence though adoption. In addition to adoption subsidies, in 2003 the United States Department of Health and Human Services awarded 25 states $14.9 million in adoption "bonuses" because those states "completed more adoptions in 2002 than in each of the five previous years."

Patton, *supra* note 15, at 175 (footnote omitted).

ble; (3) ... [and] (4) [DSS workers and legal counsel for the families are overloaded with work]; (5) the ultimate fact-finder, juvenile dependency judges, have only a few minutes per case to determine the fate of families....

Patton, *supra*, at 192. Although concurrent permanency planning is authorized in Maryland, we note that the practice of having such concurrent plans that provide for reunification or family placement and adoption should be scrutinized carefully by the court.

It is important, however, to distinguish between contingency permanency planning and concurrent permanency plans. The former looks to reunification with parents or placement with family members while permitting the DSS to begin making contingency plans for adoption or other long-term care arrangements in the event the desired reunification or family placement proves not feasible or in the children's best interest. Indeed, in some cases, that may be the most prudent thing to do, so that if, when the permanency plan is next reviewed by the court, the court concludes that adoption or other long-term arrangement is appropriate, that goal can be achieved more expeditiously—some of the groundwork will already have been done. The statute clearly allows for such contingency planning. *See* § 5–525(d)(1)–(4), *supra*.

The problem with concurrent permanency plans that are diametrically inconsistent is that they give DSS (and the parents) no real guidance and can lead to arbitrary decision-making on the part of DSS. If the court approves a permanency plan that calls for reunification or family placement, that should be the paramount goal. It should not share the spotlight with a completely inconsistent court-approved goal of terminating parental rights, especially when the inconsistent plan calls for a TPR petition to be filed before the next scheduled court review of the permanency plan. The objective of contingency planning can be achieved without a Janus-type order.

When a permanency plan for adoption, whether with a concurrent goal of reunification or adoption alone, is ordered, the statute requires the filing of a TPR petition:

(g) In the case of a child for whom the court determines that the plan should be changed to adoption ... *the court shall:*

(1) Order the local department to file a petition for guardianship in accordance with Title 5, Subtitle 3 of the Family Law Article within 30 days or, if the local department does not support the plan, within 60 days; *and*

(2) *Schedule a TPR hearing instead of the next 6–month review hearing.*

Section 3–823(g) (emphasis added).

 A natural parent's or guardian's rights are terminated as a result of an adoption.[17] *See* §§ 5–312 and 5–313 of the

---

**17.** A CINA hearing and a TPR hearing address different purposes and goals:

> Both TPR and CINA proceedings involve the State's intervention into the parent-child relationship. Both, moreover, have the overarching goal of safeguarding the best interest of the child. Yet, the specific purpose of each proceeding is quite different from the other.
>
> CINA proceedings are designed "[t]o provide for the care, protection, safety, and mental and physical development" of a child found to be in need of assistance, *"[t]o conserve and strengthen the child's family ties [.]"* These proceedings do not seek to sever the parent-child relationship. Though the parent and child are sometimes separated for the child's welfare, the desired goal is reunification[.] Even once a child is declared CINA and is placed in an out-of-home placement, a permanency plan hearing must be held within 11 months. At this hearing, the court determines the child's permanency plan, which includes, as the first option, "[r]eunification with the parent or guardian[.]"
>
> TPR proceedings, by contrast, are initiated only when the " *'prima facie* presumption that a child's welfare will be best served in the care and custody of its parents' " is overcome by a " 'show[ing] that the natural parent is unfit to have custody, or exceptional circumstances make parental custody detrimental to the best interests of the child.' " TPR proceedings are initiated as a last resort and only after efforts to reunify the parent and child, who likely has previously been adjudicated a CINA, have failed.
>
> In sum, the cases reflect that a parent is entitled to due process at a CINA adjudicatory hearing, but the process due is less than that owed a parent at a TPR hearing and still less than that owed an individual who faces the loss of personal liberty.

*In re Blessen H.*, 163 Md.App. 1, 17–18, 877 A.2d 161, 170–71 (2005); *aff'd,* 392 Md. 684, 898 A.2d 980 (2006) (citations omitted) (alterations in the original) (alterations added).

Family Law Article. A child may not be adopted unless the natural parents or legal guardian consents (and if the child is at least 10 years old, the child's consent) or a judicial proceeding terminates parental rights. Maryland Code (1999, 2004 Repl, Vol.), § 5–311(a) of the Family Law Article.[18] If a court terminates a parent's rights for adoption or guardianship purposes, it does so only if it finds by clear and convincing evidence that it is in the best interest of the child involved.[19] Section 5–313(a) of the Family Law Article. *See Carroll County Dep't of Social Svs. v. Edelmann,* 320 Md. 150, 176, 577 A.2d 14, 26 (1990) ("[A] circuit court has no authority to terminate a parental relationship other than through a decree of adoption or guardianship[.]").

## An Appealable Interlocutory Order

Generally, a party has the right to appeal from a final judgment. See Md.Code (1974, 2002 Repl.Vol.), § 12–301 of the Courts and Judicial Proceedings Article. There are several exceptions to the general rule, including taking an appeal from certain interlocutory orders:

A party may appeal from any of the following interlocutory orders entered by a circuit court in a civil case:

$$* \quad * \quad * \quad * \quad * \quad *$$

(3) An order:

$$* \quad * \quad * \quad * \quad * \quad *$$

(x) Depriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order[.]

---

**18.** Large segments of the Family Law Article were revised, effective January 1, 2006, including the sections which pertain to guardianship and adoption. For our purposes, however, we apply the Maryland Code (1999, 2004 Repl.Vol.), of the Family Law Article which was in effect at the time of the initial action.

**19.** The Legislature requires that the trial court consider statutory factors because, "the utmost caution should be exercised in any decision to terminate parental rights." *In re Adoption/Guardianship No. 87A262,* 323 Md. 12, 19, 590 A.2d 165, 168 (1991).

Md.Code (1974, 2002 Repl.Vol.), § 12–303(3)(x) of the Courts and Judicial Proceedings Article.

In *In re Samone H., supra,* this Court held that the trial court's denial of a mother's motion for an independent clinical assessment to determine whether a bond existed between her and her children was not an appealable order under § 12–303(3)(x) because the order did not of deprive the mother of the care and custody of her children or change the terms of the prior order to detrimentally impact the mother's fundamental rights. 385 Md. at 315–16, 869 A.2d at 390. In 1997, the Baltimore City Department of Social Services (BCDSS) assumed custody of Samone and Marchay, after two unsuccessful placements with a relative. *Id.* at 286–87, 869 A.2d at 372–73. In 1998, a permanency plan was established, which provided that both children were to live with relatives. *Id.* at 287–88, 869 A.2d at 373. In 1999, the court revised the permanency plan for placement with a relative or adoption. *Id.* at 288, 869 A.2d at 373–74. In 2000, after a periodic review, the judge modified the permanency plan with the goal toward adoption. *Id.* at 288–89, 869 A.2d at 374. In 2002, during an annual review hearing, a representative of the BCDSS testified that the children had developed a strong attachment with the foster family, although the visits with the natural mother were "going pretty well." *Id.* at 289, 869 A.2d 370. In 2003, the natural mother filed a motion for an independent clinical study to assess her relationship with the children and to determine whether removal of the children from foster care would be harmful.[20] *Id.* at 291, 869 A.2d at 375. The trial court denied the natural mother's motion and reaffirmed the permanency plan. *Id.* at 296, 869 A.2d at 378.

The mother in *In re Samone* requested a study which the trial court denied; however, the permanency plan for adoption remained unaltered. The trial judge affirmed the previous plan, the original plan was not changed and the order did not result in a deprivation of the mother's fundamental right to

---

**20.** The natural mother also filed a request to have her children subpoenaed to testify at another pending hearing.

care and custody of her children. We held that the bonding study may have been beneficial in assisting the court in its ruling; however, the denial of the motion for a bonding study was not an appealable interlocutory order or final judgment. *Id.* at 316, 869 A.2d at 390.

In *In re Billy W., supra*, we held that an order continuing a previously established permanency plan was not immediately appealable because the order did not detrimentally affect the parents' custody rights or visitation with the children. 386 Md. at 691–92, 874 A.2d at 433. In the case *sub judice*, the Court of Special Appeals relied on *In re Billy W.* to support its holding that the concurrent permanency plan order was not an appealable interlocutory order. That case, however, is distinguishable from the instant case. In *In re Billy W.*, four children were removed from their home and placed initially in emergency shelter care. *Id.* at 677, 874 A.2d at 424. Subsequently, the court conducted a hearing, as a result of a petition requesting judicial approval of the placement of the children in shelter care, and "ordered DSS custody of the children, and shelter care for them, pending an adjudicatory hearing." *Id.* Allegations of child sexual abuse and neglect were the genesis of the order for shelter care and the subsequent adjudicatory hearing. All four children had resided previously with Tammy B., their mother, and Tammy B.'s husband, Michael B., also father of George B., the youngest of the four children. As a result of an adjudicatory hearing, "[the] children were declared to be children in need of assistance ('CINA') and committed to the care and custody" of the Baltimore County Department of Social Services (BCDSS). *Id.* at 677–78, 874 A.2d at 424–25.

At the February 2002 adjudicatory hearing, the court established a permanency plan of reunification providing Tammy B. and Michael B. with unsupervised and supervised visitation with the children. The three older children were eventually placed in foster homes. *See id.* at 678–80, 874 at 425–26. In June 2003, the juvenile court changed the youngest child's (George B.) permanency plan from reunification to a concur-

rent plan of reunification and adoption.[21] In addition, at the June permanency plan hearing, the trial court increased the amount of unsupervised visits for the mother with three of her four children. *Id.* at 680, 874 A.2d at 426. After the November 2003 permanency plan six-month review hearing, the mother and her husband separately appealed, raising the issue that hearsay evidence was inappropriately considered by the trial court. *Id.* at 682, 874 A.2d 423. The subsequent review in this Court resulted from the six-month periodic permanency plan hearing in November 2003. *Id.* at 681, 874 A.2d 423. The mother appealed the time allocated for supervised and unsupervised visits with her children as provided by the plan. *Id.* at 682, 874 A.2d at 427–28. There was no request for review in this Court of the June 2003 order amending the permanency plan from reunification to a concurrent plan of reunification and adoption.

The issue that was before us in *In re Billy W.* is unlike the issue before us in the present case. Here the order establishing the concurrent permanency plan is the subject of the dispute before this Court. In *In re Billy W.,* the order of June 2003, which amended the permanency plan from reunification to a concurrent plan of reunification and adoption, was similar to the concurrent plan in the present case, but was not the subject of appellate review in this Court. Moreover, changes to the visitation provisions of the permanency plan, in *In re Billy W.,* emanated from the November 2003 order and were deemed by this Court not to constitute an appealable order because "court orders arising from a periodic review hearing that maintain the permanency plan[ ] ... do not constitute final judgments." *Id.* at 689, 874 A.2d at 431. The modifications made to the permanency plan in November 2003 involved maintenance of an existing plan. That plan was previously amended in June 2003, from a plan for reunification to a concurrent plan of reunification and adoption. Thus, any

---

**21.** At the time, the mother appealed the change and the Court of Special Appeals affirmed the trial court's judgment, *In re George B.,* 157 Md.App. 712 (2004). *Id.* at 680–81, 874 A.2d at 426.

orders continuing the permanency plan for the children in *In re Billy W.*, after June 2003, "did not detrimentally affect Tammy B.'s custody rights or visitation with the children, even though Tammy B. had sought full custody." *Id.* at 692, 874 A.2d at 433. Our holding in *In re Billy W.*, was limited to whether the orders of November 2003 were immediately appealable interlocutory orders. We held that "to be appealable, court orders arising from the permanency plan review hearing must operate to either deprive Tammy B. of the care and custody of her children or change the terms of her care and custody of the children to her detriment." *Id.* at 691–92, 874 A.2d 423 (citing *In re Samone H.*, 385 Md. at 282, 869 A.2d at 380; *In re Damon M.*, 362 Md. at 438, 765 A.2d at 628).

In the present case, the intermediate appellate court, erred in its interpretation of *In re Billy W.* and our narrow holding in that case. The Court of Special Appeals also distinguished *In re Damon M.*, *supra*, from the present case, on the ground that the trial court's orders terminated reunification efforts. The Court of Special Appeals opined that in *In re Damon M.*, "the permanency plans were amended from reunification to either long-term foster care or adoption. The ... [trial] court['s] orders terminated reunification efforts, and thus, detrimentally affected the parent's custodial rights." *In re Karl H.*, 163 Md.App. at 545, 881 A.2d at 1179. Ultimately, the Court of Special Appeals held that

> [o]rdering the necessary **preliminary** steps toward the possible outcome of terminating parental rights did not deprive [Petitioner] ... of the care and custody of [his] children such that the juvenile court orders were appealable interlocutory orders under CJP section 12–303(3)(x). Rather, the juvenile court's orders simply imposed additional work on CCDSS to lay the foundation for potential adoption proceedings, including filing the guardianship petitions, serving [Petitioner] ... with required notice of the guardianship proceedings ... and seeking to identify and approve a qualified family for adoption[. *S]ee* COMAR 07.01.12.04(C)(2).

*In re Karl H,* 163 Md.App. at 544–45, 881 A.2d at 1179 (alterations added) (citations omitted).

We reject the assertion that a concurrent plan of reunification and adoption is not an appealable interlocutory order and does not deprive parents of their rights to care and custody of their children. In *In re Damon M.,* we held that an "order amending a permanency plan calling for reunification to foster care or adoption is immediately appealable." 362 Md. at 438, 765 A.2d at 628. That case involved four consolidated cases where seven children were committed to the care and custody of the Montgomery County Department of Health and Human Services (MCDHHS) and all seven children had been in foster care for at least one year. *Id.* at 430, 765 A.2d at 624. In three of the cases, the trial court's order amended the permanency plan from reunification to either long-term foster care or permanent foster care.[22] *Id.* at 430–31, 765 A.2d at 624–25. The fourth case, *In re Marcello K., Lenny M., and Keshya K.,* involved three children. The trial court at the initial permanency plan hearing established a permanency plan of adoption. *Id.* at 431–32, 765 A.2d at 625. The four cases were appealed to the Court of Special Appeals. In a reported opinion, that court dismissed *In re Damon M.,* 131 Md.App. 449, 749 A.2d 231 (2000), holding that the order was not a final order. Citing the intermediate appellate court's holding in *In re Damon M.,* that court dismissed the other three appeals, in unreported opinions. *In re Damon M.,* 362 Md. at 432, 765 A.2d at 625.

We acknowledged in *In re Damon M.* the facts in *In re Marcello,* an unreported opinion of the Court of Special Appeals. The order appealed from in *In re Marcello* was for adoption and stemmed from the permanency planning hearing. We did not, however, distinguish the facts in *In re Marcello* from the facts in *In re Damon M.* when we said that

[t]he amendment of the permanency plan to long-term or permanent foster care and adoption is a change in the terms

---

**22.** The three cases were *In re Damon M.; In re Shaunna E.;* and *In re Brian J. and Tony J.*

of the custody order, whenever it was passed. The respondent acknowledges as much when it argues: "In the absence of the permanency planning orders appealed here, the previous commitment orders would have remained in effect and all of these children would have remained in the Department's custody."

The respondent asserts ... that an order approving or revising a permanency plan is not appealable.

*Id.* at 437, 765 A.2d at 628. Therefore, it is reasonable to conclude that this Court focused not only on orders that revise a permanency plan, but also on orders that approve a permanency plan when considering the question of appealability of an interlocutory order.

Further indications that we acknowledged an order approving or revising a permanency may be immediately appealable is our discussion in *In re Damon M.,* with regard to respondent's contention in that case, that other states have addressed this issue, and "concluded that an order approving or revising a permanency plan is not appealable." *Id.* We distinguished the cases cited by the respondent in support of that proposition on the basis that "[t]here apparently was no counterpart to § 12–303(3)(x) in any of the States." *Id.*

In determining whether an interlocutory order is appealable, in the context of custody cases, the focus should be on whether the order and the extent to which that order changes the antecedent custody order. It is immaterial that the order appealed from emanated from the permanency planning hearing or from the periodic review hearing. If the change could deprive a parent of the fundamental right to care and custody of his or her child, whether immediately or in the future, the order is an appealable interlocutory order.

We hold that a concurrent permanency plan that includes the option of adoption is sufficiently far enough along the continuum of depriving a parent of a fundamental right and is immediately appealable. Whether the concurrent permanency plan was ordered at the permanency planning hearing or, subsequently, at the periodic review hearing, the detrimental

effects are the same. Reunification and adoption are mutually exclusive goals, and are directly contradictory goals. Reunification gives a parent the opportunity for reconciliation. The goal of adoption, however, guarantees that, under § 3–823(g) of the Family Law Article, after thirty days at the earliest, a petition will be filed to terminate a parent's rights along with the hope of reunification.

The DSS's role is an important one in these matters—to secure a permanent, secure, and safe home for a child. The Department is required to facilitate and accelerate the process to ensure that a child is not left languishing in limbo for years. In Petitioner's case, in March 2004, it was determined that his children required emergency shelter care. By December 2004, a secure placement was obtained for the children and they were happy and thriving. Meanwhile, Petitioner was unsuccessful in completing the tasks set forth by CCDSS, such as getting clean and sober, staying clean and sober, and providing a home for his two children.

We are not unmindful of the need for a concurrent plan of reunification and adoption; however, we find that the implementation of those goals are not parallel. When the option of "adoption" enters into a permanency plan, whether alone or with a concurrent vision, under § 3–823(g) the "local department" must file a petition for TPR within thirty days (or sixty days if the local department does not support the plan). A parent is deprived of a six-month review of the permanency plan. The six-month review is replaced with a TPR hearing when "adoption" is a component of the permanency plan. *See* § 3–823(g). An interlocutory order which includes adoption as a possible outcome has the potential both to accelerate the termination and to terminate a parent's custodial rights; therefore, such orders adversely affect a parent's rights to care and custody and entitle the parent to an immediate appeal.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED AND CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT**

WITH THIS OPINION. COSTS IN THIS COURT TO BE PAID BY RESPONDENTS AND COSTS IN THE COURT OF SPECIAL APPEALS TO ABIDE THE RESULT.