937 A.2d 177

In re ADOPTION/GUARDIANSHIP OF
RASHAWN H. and Tyrese H.

No. 7, Sept. Term, 2007.

Court of Appeals of Maryland.

Dec. 11, 2007.

Cathell, J., concurred and filed a separate opinion in which Bell, C.J., joined.

478

480

Julia Doyle Bernhardt, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for petitioners.

Kimberly Shearin–Cotton, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for respondents.

Katherine J. Jones, Legal Aid Bureau, Inc., Frederick, for respondents.

Argued before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER (Retired, Specially Assigned), and DALE R. CATHELL (Retired, Specially Assigned), JJ.

ALAN M. WILNER, Judge, Retired, Specially Assigned.

Before us is a judgment of the Circuit Court for Frederick County that terminated the legal relationship between petitioner, Melissa F., and two of her four children, Rashawn and Tyrese, who were then six and five years of age, respectively. Upon evidence that the children had previously been found by the juvenile court to be children in need of assistance (CINA) and after considering the various factors then set forth in Maryland Code, § 5–313 of the Family Law Article, the court concluded that termination was in the best interest of the children, essentially because Ms. F. had been, was then, and likely would continue to be unable to care properly for them. The Court of Special Appeals, in an unreported opinion, affirmed that judgment. We shall reverse and remand for a new proceeding.

## BACKGROUND

Ms. F. suffers from the effects of several partially interrelated problems—an overall IQ of 66, an oppressive childhood, eviction from and apparent disqualification for Government assisted housing because of her drug-dealing mother, life-long poverty, inability to maintain steady employment, and lack of a reliable support system. The combination of those impediments have made her life and the early lives of Rashawn and

Tyrese terribly unstable. Ms. F. was raised in a household rife with domestic violence, with a father who physically and psychologically abused both her and her mother and a mother who became a drug addict and a drug dealer. She said that she was essentially raised, at least in her early years, by her maternal grandmother, who unfortunately died when Ms. F. was ten.

After her mother's second arrest, Ms. F. dropped out of school, in the eleventh grade, and moved first to Harrisburg to live with a step-brother and then, after a year, back to Frederick to live with a cousin. She had her first child, Mark, in February, 1997, when she was seventeen. The child's father was an alcoholic and abusive, so she ended that relationship and began one with another man, Richard, with whom she had three more children in fairly quick succession— Richard, Jr., born in June, 1998, Rashawn, born in November, 1999, and Tyrese, born in November, 2000. Richard, Jr. has lived with his paternal grandparents in Delaware since infancy. In 1999, the remainder of the family moved to an apartment apparently shared with Ms. F.'s mother. In December, 2001, they were evicted because the mother was selling drugs from the apartment.

In the three years following that eviction, which occurred when Rashawn and Tyrese were two and one, respectively, Ms. F., Mark, Rashawn, and Tyrese moved approximately eleven times. She and Richard were sometimes together and sometimes apart. The family spent a week in a hotel paid for by the Frederick County Department of Social Services (DSS), then in a shelter until May, 2002, and then briefly at a Community Action Center. They then moved to an apartment in Harrisburg, which they shared with ten other people and where they survived on peanut butter sandwiches and water, then to different shelters in Harrisburg. They finally returned to Frederick to live with Ms. F.'s mother, but the day after they arrived, the mother was incarcerated, so they moved to New York, where they stayed in various shelters and finally ended up in a roach and rat-infested apartment,

where she and Richard had to take turns staying awake at night to guard the children from the noxious animals.

In August, 2003, Ms. F. returned to Frederick to try to find work, leaving the children with her sister in New York. At some point in 2004, her sister brought the children back to Frederick, where the family found a temporary place to stay with a friend of Richard. In May, however, Richard was incarcerated, and Ms. F. and the children were forced to move. They had no place to go. On either May 19 or 20, 2004, Ms. F. took the children to the local DSS office.[1] Dorne Hill, a social worker, was called to the lobby of the building upon a report that a woman was there with three children, cursing at them and grabbing their arms. When she went to investigate, Ms. Hill found Ms. F., along with Mark, Rashawn, and Tyrese, sitting on a bench. The children were unruly but unharmed, and Ms. F. was upset. She explained that she was waiting for a family member, Mark's aunt, to come get her and her children. The aunt was contacted, but she was willing to take only Mark. Mark's father was located, and he eventually came and picked up his son but not Ms. F. or the other children.

When it appeared that there was no place for Rashawn and Tyrese to go, Ms. F. and Ms. Hill agreed that the only alternative was for DSS to place the two children in emergency shelter care. Richard, who by then had married another woman, later agreed to that disposition as well. After a hearing two days later, the shelter care was continued. The court found that it was not possible to return the children to their home because of the father's incarceration and Ms. F.'s lack of a residence. There was no home to which they could return. On June 16, 2004, based, in part, on "the lack of a permanent residence for the children, and on the agreement of the parties," the children were found by the juvenile court to be CINA. Among other things, the court ordered psychiatric, psychological, substance abuse, and parenting potential evalu-

---

1. There is some discrepancy in the record as to the exact date.

ations, that Ms. F. enter into and comply with a service agreement, that she maintain steady and reliable employment and adequate and appropriate housing, and that she participate in the "DORS" program.[2] No appeal was taken from that disposition, so the validity of it is not before us.

DSS, for its purposes, found insufficient evidence to show an "indicated" child neglect on Ms. F.'s part, in that, although she had been unable to secure resources for her children, she had attempted to do so and was willing to "g[i]ve up her children because she could not provide instead of allowing her children to be homeless and hungry." On the other hand, DSS declared that it could not "rule out" neglect, in that Ms. F. "had been homeless and transient for several years." It therefore declared child neglect to be "unsubstantiated," the only other category possible under the circumstances.

Upon assuming custody of the children and in preparation for the CINA hearing, DSS sought an evaluation from Dr. Dennis Hilker, a psychologist, who reported, in relevant part, that, although Ms. F. had an emotional attachment to her children and wanted to be a productive mother, she showed "little parenting ability," had "no job skills," and would "require a great deal of assistance and supervision to meet the needs of her children." He found that both parents were "cognitively challenged," that they had not developed any "consistent, reliable employment base," and would need "a long time to build their educational and vocational capacity for self-support, before proposing any possible home for the children to return to their custody."

At the time of the evaluation—some three weeks after she took the children to DSS—Ms. F. was still homeless, was on a waiting list for an apartment, had no income, and "wanders

---

2. The "DORS" program is mentioned frequently in the record. It refers to the Division of Rehabilitation Services, a unit within the State Department of Education. The Division has a vocational rehabilitation program that provides career assessment, vocational training, assistive technologies, and job placement services. *See* the Division's web site at www.dors.state.md.us.

the streets when she cannot stay with anyone." Dr. Hilker said that she had "some good parenting potential" but that she needed "to develop some self-controls, personal life goals, and long term lifestyle accommodations." He recommended that she receive supervised visitation privileges with the children, that she be referred to the Division of Rehabilitative Services for vocational training and work assistance, and that the parents meet with DSS "to consider a long term custody and visitation arrangement to guarantee the safety and welfare of the children. . . ."

In his report on Richard, Dr. Hilker concluded that Richard "shows questionable parenting ability" and "limited intelligence, perhaps because of intensive drug abuse earlier in his life." He added that Richard was "unlikely to succeed in parenting without special services to meet his difficulties."

The social worker initially assigned to the case, Brenda Boone, stated that Tyrese remained in the foster home during the four months that she supervised the case but that Rashawn had to be moved five times during that period because of his behavior, which she described as "out of control." Ultimately, he was placed in a "therapeutic" foster home, where the caretakers were specially trained to care for children with behavioral or emotional problems. Ms. F. told Ms. Boone that she was living with her mother and her mother's boyfriend, although she gave the social worker an aunt's telephone number.

Ms. F. eventually found employment at Wal–Mart and she did participate in most of the programs as directed in the CINA disposition order and in one or more service agreements with DSS. Reports prepared for the first court review hearing in December, 2004, by Heather Chorney, the new social worker assigned to the case, were positive. Ms. Chorney confirmed that Ms. F. had, on the whole, complied with the court's directives and that supervised visitation had occurred. Her overall impression was that "[p]rogress has been made; however, the risk and safety factors that lead to the children being brought into care have yet to be eliminated."

She recommended that the children remain CINA and in foster care but that the permanency plan for the children be reunification with Ms. F., and that is what occurred.

The next review hearing was in April, 2005. Again, Ms. Chorney's report was positive. Ms. F. continued to comply with most of the court's directives and maintained her employment with Wal–Mart. Rashawn's behavior and emotional well-being had improved. Ms. Chorney still believed, however, that the factors that led to the children being placed in foster care had yet to be eliminated. She continued her recommendation that the children remain in foster care and that the permanency plan be for reunification with Ms. F.

The reports prepared for the hearing in August, 2005, were less favorable. Ms. Chorney noted that "[t]here has been little progress toward reunification since the last Court hearing." Rashawn's situation had "been regressing," in that he "has attached to his foster parents and has a great deal of anxiety about the status of reunification." Tyrese, on the other hand, was "doing very well and there are no concerns at this time." Unfortunately, Ms. F. lost her job at Wal–Mart in April. She found part-time employment at Goodwill Industries but worked there only for a month or so. The principal problem seemed to be that, despite the assistance of a parent aide from DSS, Ms. F. remained unsuccessful in finding adequate housing for herself and the children. She had been denied public housing because of the past eviction, and the prospect of living with her sister was rejected because the sister (1) had a substance abuse history, and (2) did not have housing for the children. Although Ms. Chorney recommended that the permanency plan still be for reunification, she expressed concern about the length of time the children had been in foster care and the "permanency issues," and she noted that DSS "may recommend a change of permanency plan at the next hearing if progress is not adequate."

That is what, in fact, occurred at the next review hearing in November, 2005. Both children had adjusted well to their foster care placements. Tyrese was "in a potential pre-

adoptive placement." Rashawn had "become very attached to his foster care parents" and "displays a great amount of anxiety about reunification." The children had been in out of home placement for eighteen consecutive months. Although Ms. F. continued to comply with the court orders and "greatly struggled" to maintain overall stability in her own life, Ms. Chorney stated that Ms. F.'s progress toward reunification and the children's permanency "remains a concern."

Ms. F. had lost her part-time job with Goodwill Industries in July, but in October found one with a Holiday Inn. Her employment situation remained sporadic, and housing continued to be a major issue. In October, Ms. F. was evicted for non-payment of rent. DSS assigned a parent aide to assist her in finding a suitable home, but they had no success. The problem was that, because of her eviction due to her mother's drug-dealing, she was unable to obtain public housing and had insufficient income to afford adequate non-assisted living. She eventually found a one-room apartment but had to share a communal bathroom with everyone else on the floor, and DSS did not view that arrangement as adequate for a woman with two children.[3] Continuing to believe that the risk factors that caused the children to be placed in foster care had not been alleviated, even after eighteen months, DSS recommended that the permanency plan be changed to adoption with a concurrent plan of reunification with Ms. F.[4] Ms. Chorney expressed concern that it was a struggle for the parents to maintain their own everyday living without the burden of dealing with Rashawn's complex problems. She said, however, that DSS would continue to work with Ms. F. toward reunification.

---

3. Although Ms. F. highlights that view as wholly inappropriate, it was not the basis of the TPR judgments and was not even mentioned by the court. Indeed, Ms. F. was no longer living in that room at the time of trial. At the time, a parent aide was assisting Ms. F. in attempting to find more suitable housing for the children.

4. By this time, the father was more or less out of the picture. That is not an issue in this appeal.

In her report, Ms. Chorney recounted the efforts DSS had made to assist in achieving reunification and listed what she regarded as the "compelling reasons" for the change:

(1) The children had been in care for 18 consecutive months;

(2) Because of the children's ages, there was a need "to establish stability and permanency as soon as possible;

(3) Risk and safety factors had not been alleviated by the parents;

(4) Reunification services "have been exhausted";

(5) The parents' progress is such that reunification was not likely in the next six months;

(6) The children were unable to reside with Ms. F. due to "the lack of appropriate housing, financial instability, mental health needs of the child[ren], substance abuse [by the father], and a history of the parent's overall instability;" and

(7) There were no identifiable, appropriate, or willing relatives to provide long term care.

On November 17, 2005, the juvenile court concurred in that recommendation. It ordered that the permanency plan for the children be "adoption with a concurrent plan of reunification with the mother," and, notwithstanding that purported concurrence, directed DSS to file a petition to terminate parental rights (TPR) within 30 days.[5] DSS filed the TPR

---

5. In *In re Karl H.*, 394 Md. 402, 422, 906 A.2d 898, 909 (2006), we pointed out permanency plans which call, concurrently, for both reunification and adoption are intrinsically inconsistent, that they give DSS no real guidance, and that they can lead to arbitrary decision-making on the part of DSS. We concluded:

"If the court approves a permanency plan that calls for reunification or family placement, that should be the paramount goal. It should not share the spotlight with a completely inconsistent court-approved goal of terminating parental rights, especially when the inconsistent plan calls for a TPR petition to be filed before the next scheduled court review of the permanency plan. The objective of contingency planning can be achieved without a Janus-type order."

petition in December, 2005; trial occurred in May, 2006, and, on May 23, the court granted the petition and entered judgments terminating the parental rights of Ms. F. and the father in Rashawn and Tyrese and appointing the Director of DSS as the guardian of the children with the right to consent to their adoption. In February, 2006, prior to trial, Ms. F. left her one-room apartment in Frederick, which she was apparently sharing with her mother, and her job with Holiday Inn and went to Virginia to look for work and housing. Unsuccessful, she returned and began living again with her mother a month later.

The statutory standards governing the termination of Ms. F.'s parental rights in this case are those that previously were set forth in Maryland Code, § 5-313 of the Family Law Article (FL).[6] Section 5-313 was an exception to the general rule that an individual may not be adopted without the consent of his or her natural parents. It permitted a circuit court to grant a decree of adoption or guardianship with the right to consent to adoption, without the consent of the natural parents, if the court found by clear and convicting evidence that (A) it was in the best interest of the child to terminate the natural parents' rights as to the child, and (B) one of the following three circumstances or set of circumstances existed:

---

*Karl H.* was not filed until September, 2006, so the juvenile court here did not have the advantage of our views on what was then a common practice by DSS. The anomaly of having the order both continue reunification as a goal and direct the filing of a TPR petition within 30 days is evident on its face, however.

**6.** In its 2005 Session, the General Assembly enacted 2005 Md. Laws, ch. 464, the Permanency for Families and Children Act of 2005, which substantively revised the laws relating to guardianships and the termination of parental rights. The standards previously set forth in FL § 5-313, as revised, are now found in FL § 5-323. Although the Act took effect January 1, 2006, prior to the trial and judgment in this case, Section 4 of the Act provides that the Act did not apply to any case pending on January 1, 2006, and that such cases "shall be governed by the law applicable as if this Act had not become effective." As DSS's petition was filed in December, 2005, and therefore was pending on January 1, 2006, the case is governed by the provisions in the former § 5-313.

(1) The child was abandoned; *i.e.*, the identity of the child's natural parents was unknown and no one had claimed to be the child's natural parent within two months after the alleged abandonment;

(2) In a prior juvenile court proceeding, the child was adjudicated to be CINA; or

(3) The following four circumstances exist:

 (i) The child has been continuously out of the custody of the natural parent and in the custody of a child placement agency for at least a year;

 (ii) The conditions that led to the separation from the natural parent or similar conditions of a potentially harmful nature still exist;

 (iii) There is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the immediate future; and

 (iv) A continuation of the parental relationship would greatly diminish the child's prospects for early integration into a stable and permanent family.

Unless the court finds an abandonment, *i.e.*, if it is proceeding under (2) or (3) above, it must, in determining whether termination is in the best interest of the child, give primary consideration to the safety and health of the child and give consideration as well to the other factors that were enumerated in FL § 5–313(c).[7] If the child had been declared CINA,

---

7. Those factors, as we paraphrase them, were:

 (i) the timeliness, nature, and extent of the services offered by DSS to facilitate reunion of the child with the parent;

 (ii) any social service agreement between the parent and DSS and the extent to which the parties fulfilled their obligations under the agreement;

 (iii) the child's feelings toward and emotional ties with the parents, siblings, and others who may significantly affect the child's best interest;

 (iv) the child's adjustment to home, school, and community;

 (v) the result of the effort the parent has made to adjust his or her circumstances, conduct, or conditions to make it in the child's best interest to be returned to the parent; and

the court, in determining whether termination is in the best interest of the child, was required to consider as well the additional factors that were set forth in § 5–313(d).[8]

The evidence presented at the TPR hearing was largely that noted above, although it was supplemented with some additional details. The social workers who prepared the various reports testified, as did Ms. F. and Dr. Carlton Munson, a social worker who prepared an "attachment assessment report" based on an evaluation of Rashawn and Tyrese conducted shortly before the hearing. Dr. Munson was aware that Rashawn was facing a change of placement because of "aggressive and sexualized behaviors." With that knowledge and upon his own observation of the children's interaction with each other, he concluded that "a joint placement would not be in the best interest, well-being, safety, or health of either child." He explained in his report that Rashawn's history of sexualized behaviors "make it highly likely [that] sexual behaviors would be acted out on Tyrese if these siblings were in the same placement" and that "Tyrese would be at physical and psychological risk." Ms. Chorney commented that, except for a brief period, visitation with the children was supervised because of the unstable relationship between Ms. F. and

---

(vi) all services offered to the parent before placement of the child.

**8.** The considerations set forth in FL § 5–313(d) are, as we paraphrase them:

(i) whether the parent has a disability that renders him or her consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time;

(ii) whether the parent has committed acts of abuse or neglect toward any child in the family;

(iii) the parent has repeatedly failed to give the child adequate food, clothing, shelter, education, or other care or control necessary for the child's physical, mental, or emotional health, even though the parent is physically and financially able;

(iv) the child was born exposed to certain drugs or the mother tested positive for those drugs upon admission to a hospital for delivery of the child;

(v) the parent subjected the child to torture, chronic abuse, sexual abuse, or chronic and life-threatening neglect, or was convicted of certain crimes of violence committed against a child or household member.

Richard and Ms. F.'s unwillingness to agree to separate visitation

Ms. F. confirmed the several attempts she had made to find assisted housing. She was told that she was ineligible for county-assisted housing but eligible for Federal Section 8 assistance. The problem was that there were no apartments available. She said that if she could live with her mother, they could pool their resources and afford a larger apartment that could accommodate the children and that her mother could watch the children when she was at work. Because of her mother's drug history, however, DSS did not regard the mother as an acceptable resource.

The court noted the undisputed fact that Rashawn and Tyrese had been found to be CINA, and it therefore proceeded to consider the factors set forth in FL § 5–313(c) and (d) in determining whether it was in their best interest to terminate Ms. F.'s parental rights. Relying in part on Dr. Munson's report and testimony, it found, first, that the children had health and safety needs that would be better addressed through services that DSS could provide if granted guardianship. Turning to the remaining factors in § 5–313(c), the court found that DSS had made "abundant efforts" to provide Ms. F. with services, and that, although DSS fulfilled its obligations under the service agreements, "it just wasn't working." Despite her effort, but due to her disabilities and limitations, Ms. F. "just wasn't able to comply with all of those ... services to facilitate reunification that the Department provided her." The court stated that, because of the children's age and because they had been out of the home for so long—nearly two years—it was "not sure" that they had much attachment left to Ms. F. or to each other.

The court found the children's adjustment to their foster homes "troubling," but improving. The court complimented Ms. F. on her effort to adjust her circumstances and maintain contact with the children but made no clear finding as to the adequacy of her adjustment or contact. The implication is that the court found the adjustment inadequate to provide a

safe and healthy environment for the children, but its actual statement is less than clear on that point. It did find that Ms. F. lacked the financial resources to provide for the children's financial and material needs. It said that Ms. F. had done "a pretty good job" of maintaining contact with DSS, but that it was not sufficient to guarantee the safety and health of the children. The court did not explain the connection between any lack of contact with DSS and the safety and health of the children. Finally, as to the § 5–313(c) factors, the court found that no further services could be provided that would help return the children to Ms. F.

Turning then to the § 5–313(d) factors, the court concluded that Ms. F. did have a disability that limited her ability to care for the children, and that, due to that disability and her circumstances, she did neglect the children. The neglect was not intentional, but it was a fact. The court found none of the other § 5–313(d) factors applicable. Upon its consideration of all of the statutory factors, the court found by clear and convicting evidence that it was in the best interest of the children to grant the DSS petition, and, in accordance with that finding, it entered the two judgments, one for Rashawn and one for Tyrese.

In the Court of Special Appeals, Ms. F. attacked some of the Circuit Court's findings with respect to the various factors, contending that they were either unsupported by more specific factual determinations or otherwise clearly erroneous. After reviewing the record, the appellate court held that there was ample support for the trial court's findings. The thrust of Ms. F.'s argument was that DSS had not provided adequate services tailored to Ms. F.'s needs and that Ms. F. lost custody of the children in the CINA proceeding and lost her parental rights in the TPR case "because she was homeless, ... her disability prevented her from curing that condition, and the Department failed to tailor its services to remove those barriers to reunification." She made no attack on the statute itself. The Court of Special Appeals disagreed, concluding that "throughout the two years that Rashawn and Tyrese were in foster care before the TPR hearing, Ms. F. was provided with

ample services aimed at reunification" and that she had "not identified in the record any other available programs that were specifically tailored to her needs as a person with cognitive disabilities."

Although still complaining that DSS failed to provide adequate services to her and that some of the Circuit Court's conclusions were wrong, Ms. F. has substantially broadened her argument in this Court. She now attacks the structure and validity of the statute itself, tacitly at least contending that, by focusing on the best interest of the child, the statute is unconstitutional. In that regard, she argues first that a court may not terminate the parental rights of a parent absent a showing that the parent "is presently unfit or proof of other exceptional circumstances." She adds that parental rights may not be terminated where "the basis for the CINA finding, and the primary obstacle to reunification, is lack of permanent suitable housing," thereby implying that the lack of suitable housing, even over a four or five year period, cannot be regarded as either evidence of unfitness or an exceptional circumstance.

## DISCUSSION

### *The Appropriate Standards for Terminating Parental Rights*

In seeking to dismantle the statutory construct enacted by the General Assembly, Ms. F. borrows in part from cases involving custody disputes between a parent and a third party and in part from out-of-State TPR cases that are mostly inapposite. We shall turn first to the custody cases and consider their relevance to the issue at hand.

█ The great majority of custody (and visitation) disputes, of course, are between the child's parents, neither of whom, at least since the adoption of our State Equal Rights Amendment (Md. Decl. of Rts., Art. 46), has any preference over the other in that regard. In that setting, the governing standard, here and throughout the country, is and long has been the child's best interest. *See McDermott v. Dougherty*, 385 Md. 320,

353–55, 869 A.2d 751, 770–71 (2005). Custody and visitation decisions in disputes between the parents are made based on what the court finds to be in the child's best interest. That decision generally lies within the sound discretion of the trial judge and is rarely disturbed on appeal. *See Domingues v. Johnson,* 323 Md. 486, 492, n. 2, 593 A.2d 1133, 1136, n. 2 (1991).

A different element, though not a different standard, comes into play when the dispute is between a parent and a third party, for in that setting, there *is* a legal preference. In those cases, we have recognized that parents have a fundamental, Constitutionally-based right to raise their children free from undue and unwarranted interference on the part of the State, including its courts. *See,* most recently, *Koshko v. Haining,* 398 Md. 404, 921 A.2d 171 (2007); *also McDermott v. Dougherty, supra,* 385 Md. 320, 869 A.2d 751; *Shurupoff v. Vockroth,* 372 Md. 639, 814 A.2d 543 (2003); *Ross v. Hoffman,* 280 Md. 172, 372 A.2d 582 (1977). Even in those cases, however, we have not discarded the best interest of the child standard, but rather have harmonized it with that fundamental right.

 We have created that harmony by recognizing a substantive presumption—a presumption of law and fact—that it is in the best interest of children to remain in the care and custody of their parents. The parental right is not absolute, however. The presumption that protects it may be rebutted upon a showing either that the parent is "unfit" or that "exceptional circumstances" exist which would make continued custody with the parent detrimental to the best interest of the child. In *McDermott,* the Court made clear that, in a parent-third party custody dispute, the initial focus must be on whether the parent is unfit or such exceptional circumstances exist, for, if one or the other is not shown, the presumption applies and there is no need to inquire further as to where the best interest of the child lies. In *Koshko,* we extended that approach to parent-third party visitation disputes as well.

Custody and visitation disputes, even between a parent and a third party, are on a different plane than TPR proceedings.

As we pointed out in *Shurupoff,* "[w]e regard TPR proceedings as unique—different in kind and not just in degree." *Shurupoff,* 372 Md. at 657, 814 A.2d at 554. That, we said, is true for two reasons. First, a TPR judgment does not just allocate access to a child but constitutes a total rescission of the legal relationship between parent and child, and that rescission is generally final. Unlike custody or visitation orders, it is not subject to reconsideration merely upon a showing of changed circumstances on the parent's part. Second, in custody and visitation cases the State is essentially neutral, providing only a judicial forum for resolution of the dispute between two private parties. In TPR cases, the State is a moving party, acting in its capacity as *parens patriae.* It is seeking to terminate the existing parental relationship and transfer to itself, hopefully for re-transfer to an adoptive family, the parental rights that emanate from that relationship.

Nonetheless, our case law has been clear and consistent, that, even in contested adoption and TPR cases (and in permanency plan proceedings that may inevitably lead to a TPR case), where the fundamental right of parents to raise their children stands in the starkest contrast to the State's effort to protect those children from unacceptable neglect or abuse, the best interest of the child remains the ultimate governing standard.[9] Most recently, in *In re Karl H.,* 394 Md.

---

9. *See Wash. Co. Dep't Soc. Serv. v. Clark,* 296 Md. 190, 198, 461 A.2d 1077, 1081 (1983), (citing cases dating back to 1958 for the principle that "when the State seeks to terminate parental rights without the consent of the parents, the matter should be determined on the basis of what is in the best interests of the child"); *In re Adoption/Guardianship No. 10941,* 335 Md. 99, 113, 642 A.2d 201, 208 (1994) ("We have made clear, however, that the controlling factor in adoption and custody cases is not the natural parent's interest in raising the child, but rather what best serves the interest of the child"); *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 301, 701 A.2d 110, 113 (1997) ("[T]he best interest of the child standard continues to be the uncompromising standard in all adoption proceedings. . . ."). Although those cases were decided before *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), we have continued to view the best interest of the child as a paramount consideration. *See In re Mark M.,* 365 Md. 687,

402, 416, 906 A.2d 898, 906 (2006), involving an attack on a change in a permanency plan from reunification to reunification and adoption, we noted:

> "A State's role in a child's care and protection should take on utmost importance, while a parent's right may not be absolute. A parent's rights may be diminished, ['w]hen there is a conflict between the rights of the parents or legal guardian and those of the child, the child's best interest shall take precedence.' COMAR 07.02.11.07(A)."

All of those cases recognize and give full appropriate weight to the fundamental right of the parents, as indeed they must, but they all recognize as well that the right of the parents is not absolute and that it must be balanced against the fundamental right and responsibility of the State to protect children, who cannot protect themselves, from abuse and neglect. The point was well made in *In re Mark M., supra,* 365 Md. at 705–06, 782 A.2d at 343, and confirmed in *In re Yve S., supra,* 373 Md. at 570, 819 A.2d at 1041:

> "That fundamental interest, however, is not absolute and does not exclude other important considerations. Pursuant to the doctrine *of parens patriae,* the State of Maryland has an interest in caring for those, such as minors, who cannot care for themselves. We have held that 'the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute.'.... As we stated in *In re Adoption/Guardianship No. A91–71A,* 334 Md. 538, 640 A.2d 1085 (1994), the child's welfare is 'a consideration that is of "transcendent importance"' when the child might otherwise be in jeopardy."

In light of that well-established case law, it is not surprising that the General Assembly, in enacting former FL § 5–313

---

705–06, 782 A.2d 332, 342–43 (2001); *In re Yve S,* 373 Md. 551, 570–71, 819 A.2d 1030, 1041–42 (2003); *In re Billy W.,* 386 Md. 675, 684, 874 A.2d 423, 429 (2005) ("the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute").

and current FL § 5–323, has maintained the best interest of the child standard as the overriding statutory criterion in TPR cases. There are, however, three critical elements in the balance that serve to give heightened protection to parental rights in the TPR context. First and foremost, is the implicit substantive presumption that the interest of the child is best served by maintaining the parental relationship, a presumption that may be rebutted only by a showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest. That presumption, which emanates from parent-third party custody disputes, is not expressly articulated in the statute and, for that reason, is usually not mentioned when discussing the various statutory factors, but it may be necessary as a Constitutional matter and, even if not, it is implicit from the statutory scheme. The notions of "unfitness" and "exceptional circumstances" have a different connotation in TPR cases than they do in custody and visitation disputes, however. In a custody case, unfitness means an unfitness to have *custody* of the child, not an unfitness to remain the child's parent; exceptional circumstances are those that would make parental *custody* detrimental to the best interest of the child.

The deficiencies that may properly lead to a finding of unfitness or exceptional circumstances in a custody case will not necessarily suffice to justify a TPR judgment. For one thing, those deficiencies may be temporary and correctable—sufficiently severe to warrant denying custody or visitation at a particular point in time, but with the understanding that the custody or visitation decision is subject to reconsideration upon a showing of changed circumstances. As noted, however, a judgment terminating parental rights, once enrolled, is not subject to discretionary reconsideration based merely on the parent's changed circumstances. *See,* however, FL §§ 5–326 and 5–327, permitting modification or rescission of a guardianship order under certain limited circumstances.

■ To justify a TPR judgment, therefore, the focus must be on the continued parental relationship, not custody. The facts must demonstrate an unfitness to have a continued parental relationship with the child, or exceptional circumstances that would make a continued parental relationship detrimental to the best interest of the child. The terms are the same, but their meaning and what must be shown are quite different.

■ The second element that serves to protect the parental relationship is that, in a TPR case, the kind of unfitness or exceptional circumstances necessary to rebut the substantive presumption must be established by clear and convincing evidence, not by the mere preponderance standard that applies in custody cases. The State must overcome a much higher substantive burden by a higher standard of proof.

Third, and of critical significance, the Legislature has carefully circumscribed the near-boundless discretion that courts have in ordinary custody cases to determine what is in the child's best interest. It has set forth criteria to guide and limit the court in determining the child's best interest—the factors formerly enumerated in FL § 5–313(c) and (d) and now stated in FL § 5–323. Those factors, though couched as considerations in determining whether termination is in the child's best interest, serve also as criteria for determining the kinds of exceptional circumstances that would suffice to rebut the presumption favoring a continued parental relationship and justify termination of that relationship.

■ We agree with Ms. F. that poverty, of itself, can never justify the termination of parental rights. The fundamental right of parents to raise their children is in no way dependent on their affluence and therefore is not diminished by their lack thereof. Nor will homelessness, alone, or physical, mental, or emotional disability, alone, justify such termination. That is not what the statute permits, however.[10] What the statute

---

**10.** FL § 5–525(c)(2), which is part of the statute dealing with out-of-home placement and foster care, expressly provides that a child may

appropriately looks to is whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare. As former FL § 5–313(c)(1) and current § 5–323(d) make clear, primary consideration must be given to "the safety and health of the child."

■ The statute does not permit the State to leave parents in need adrift and then take away their children. The court is required to consider the timeliness, nature, and extent of the services offered by DSS or other support agencies, the social service agreements between DSS and the parents, the extent to which both parties have fulfilled their obligations under those agreements, and whether additional services would be likely to bring about a sufficient and lasting parental adjustment that would allow the child to be returned to the parent. Implicit in that requirement is that a reasonable level of those services, designed to address both the root causes and the effect of the problem, must be offered—educational services, vocational training, assistance in finding suitable housing and employment, teaching basic parental and daily living skills, therapy to deal with illnesses, disorders, addictions, and other disabilities suffered by the parent or the child, counseling designed to restore or strengthen bonding between parent and child, as relevant. Indeed, the requirement is more than implicit. FL § 5–525(d), dealing with foster care and out-of-home placement, explicitly requires DSS to make "reasonable efforts" to "preserve and reunify families" and "to make it possible for a child to safely return to the child's home."

■ There are some limits, however, to what the State is required to do. The State is not obliged to find employment for the parent, to find and pay for permanent and suitable housing for the family, to bring the parent out of poverty, or to cure or ameliorate any disability that prevents the parent from being able to care for the child. It must provide

not be committed to the custody or guardianship of DSS and placed in an out-of-home placement "solely because the child's parent or guardian lacks shelter or solely because the child's parents are financially unable to provide treatment or care for a child with a developmental disability or mental illness."

reasonable assistance in helping the parent to achieve those goals, but its duty to protect the health and safety of the children is not lessened and cannot be cast aside if the parent, despite that assistance, remains unable or unwilling to provide appropriate care.

The State is not required to allow children to live permanently on the streets or in temporary shelters, to fend for themselves, to go regularly without proper nourishment, or to grow up in permanent chaos and instability, bouncing from one foster home to another until they reach eighteen and are pushed onto the streets as adults, because their parents, even with reasonable assistance from DSS, continue to exhibit an inability or unwillingness to provide minimally acceptable shelter, sustenance, and support for them. Based upon evidence of the effect that such circumstances have on the child, a court could reasonably find that the child's safety and health of the child is jeopardized. Recognizing that children have a right to reasonable stability in their lives and that permanent foster care is generally not a preferred option, the law requires, with exceptions not applicable here, that DSS file a TPR petition if "the child has been in an out-of-home placement for 15 of the most recent 22 months." *See* FL § 5–525.1(b).

The court's role in TPR cases is to give the most careful consideration to the relevant statutory factors, to make specific findings based on the evidence with respect to each of them, and, mindful of the presumption favoring a continuation of the parental relationship, determine expressly whether those findings suffice either to show an unfitness on the part of the parent to remain in a parental relationship with the child or to constitute an exceptional circumstance that would make a continuation of the parental relationship detrimental to the best interest of the child, and, if so, how. If the court does that—*articulates its conclusion as to the best interest of the child in that manner*—the parental rights we have recognized and the statutory basis for terminating those rights are in proper and harmonious balance.[11]

---

11. As noted, Ms. F. cites a number of out-of-State TPR cases in support of her theories. None of them require a different view than that we

## This Case

■ Apart from her attack on the structure of the statute, Ms. F.'s principal complaint is that DSS did not provide adequate services to her. She complains that she was "unable to secure housing without assistance" and that DSS "did not provide her with housing assistance." It is true that she was unable to secure housing—at least housing adequate for her and the children. It is not true that DSS failed to provide her with assistance. The record shows, and the court properly found, that she received substantial help from DSS in attempting to locate suitable housing.

The basic problem seemed to be that, because of her sporadic employment, much of it part-time, at entry-level wages, Ms. F. was unable to afford an apartment large enough to accommodate her and the children unless (1) she lived with

---

have taken. Three of the cases are from New Jersey. In *Guardianship of K.L.F.*, 129 N.J. 32, 608 A.2d 1327 (1992) and *Guardianship of J.C.*, 129 N.J. 1, 608 A.2d 1312 (1992), the court construed the New Jersey statute as requiring the State "to make an affirmative demonstration that the child's best interests will be 'substantially prejudiced' if parental rights are not terminated." *K.L.F.*, 608 A.2d at 1329. The State's argument in both cases was that the children would suffer psychological harm if separated from their foster parents. Although the court recognized that serious and lasting emotional or psychological harm to children as the result of action or inaction by the parents *can* constitute injury sufficient to justify termination of parental rights, it found insufficient evidence in the respective records to support such a finding. In *Guardianship of J.C.*, the court remanded the case for further proceedings on that issue. *Matter of Baby M.*, 109 N.J. 396, 537 A.2d 1227 (1988) involved an action by the natural parents of Baby M. to terminate any parental rights possessed by a woman who acted as a surrogate mother. Massachusetts has adopted the view, as a matter of its own State law, that the State may not attempt to force the breakup of a natural family "without an affirmative showing of parental unfitness," but it has defined unfitness in terms of whether "returning the child to the natural parents would be seriously detrimental to the welfare of the child." *Petition of Department of Public Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 421 N.E.2d 28, 37 (1981), quoting in part from *Custody of a Minor (1)*, 377 Mass. 876, 389 N.E.2d 68 (1979) and *Bezio v. Patenaude*, 381 Mass. 563, 410 N.E.2d 1207 (1980). That is not substantially different from the conclusions we reach here. An Alabama case cited by Ms. F., *Ex parte T.V.*, has yet to be released for publication.

her mother, or (2) she was able to qualify for Government housing assistance and find an apartment either in a public housing project or that accepted housing assistance tenants. DSS quite properly declined to regard the mother, in light of her drug-dealing history, which on one or more occasions caused Ms. F. and the children to be evicted, as an acceptable resource for the children. The drug-dealing evictions apparently made Ms. F. ineligible for at least some government housing assistance, and, to the extent she was eligible for Section 8 voucher assistance, as she claimed, there were no apartments available. The record shows that DSS provided referrals and transportation to local housing agencies and helped her prepare applications, but it obviously had no authority to change the rules applicable to such units or to make a local public housing agency accept Ms. F. as a tenant or provide Section 8 assistance when there were other families ahead of her on the waiting list. Ms. F. has not indicated with any particularity what more DSS was required to do or, indeed, could reasonably have done.

 Ms. F. also complains that DSS refused to return the children to her, notwithstanding her lack of suitable housing and stable employment, and then made a point of the diminished contact and bonding between her and the children. With the children having been found CINA and placed in the custody of DSS due to neglect arising from lack of housing, DSS was not obliged to return the children to Ms. F. when she still had no adequate housing and, in the view of DSS, the conditions that caused the children to be CINA had not been alleviated. Ms. F. did have and, for the most part, did exercise weekly visitation with the children. Access to them was never denied.

 Notwithstanding our rejection of Ms. F.'s principal complaints, we shall direct that the judgments of the Circuit Court be vacated and that the cases be remanded for further proceedings, for two reasons. The first is a concern over some of the court's findings, at least as articulated. As noted, FL § 5–313(c) required that the court give primary consideration to the safety and health of the children. The court

seemed to resolve that factor by noting that the children had "special needs"—health and safety needs—which "are better served by granting the Department the guardianship." The court did not identify those needs but simply adopted counsel's argument that the children's safety "required that they be given a chance for an opportunity to have all those services that they need that the Department can ... provide if I grant the guardianship." The court did not indicate what services DSS could provide if guardianship was granted that it could not provide otherwise. Whatever the court had in mind, that is not a clear or sufficient explanation of why the safety and health of the children required termination of Ms. F.'s parental rights. Even Dr. Munson's opinion that a joint placement of Rashawn and Tyrese was not appropriate would not suffice to establish that a continuation of the parental relationship would be detrimental to the health or safety of the children.

One of the considerations in former § 5–313(c) is the children's "feelings toward and emotional ties with the [children's] natural parents." As to that, all the court could find is that it was "not sure" Rashawn and Tyrese had much attachment left to Ms. F. Given the State's burden to establish by clear and convincing evidence Ms. F.'s unfitness or exceptional circumstances that would make continuation of the parental relationship detrimental or the children's best interest, that is not a sufficient finding, to be "not sure."

The court, as noted, complimented Ms. F. on her effort to maintain contact with the children but made no finding as to the adequacy of that effort. Although concluding that Ms. F. had done "a pretty good job" of maintaining communication with DSS, it found that the effort was not sufficient to "guarantee the safety and health of the children." The court did not explain the connection between any lack of communication, to the extent there was any such lack, and the safety and health of the children.

■ Principally, the problem is that the court, understandably in light of the statutory language and not having the benefit of the views we express in this Opinion, did not relate the findings it made with respect to the statutory factors to

the presumption favoring continuation of the parental relationship or to any exceptional circumstance that would suffice to rebut that presumption. That needs to be done. On remand, the court will have to make clear and specific findings with respect to each of the relevant statutory factors and, to the extent that any amalgam of those findings leads to a conclusion that exceptional circumstances exist sufficient to rebut the presumption favoring the parental relationship, explain clearly how and why that is so. We suggest that, since eighteen months have elapsed since the May, 2006 hearing, the parties be given the opportunity to offer evidence of what has occurred in the meantime and the current status of Ms. F. and the children.[12]

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE JUDGMENTS OF CIRCUIT COURT FOR FREDERICK COUNTY AND REMAND TO THAT COURT FOR FURTHER PROCEEDINGS IN CONFORMANCE WITH THIS OPINION; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.

BELL, C.J., and CATHELL, J., Concur.

Concurring opinion by CATHELL, J. which BELL, C.J. joins.

I concur in the judgment. I write to make clear my position. As I read the majority's opinion, it incorporates that

---

12. We do not regard this Opinion as changing any substantive law. By requiring trial courts to relate their findings as to the statutory factors to the presumption favoring a continuation of the parental relationship and to the two circumstances that would rebut that presumption— parental unfitness or exceptional circumstances that would make continuation of the parental relationship detrimental to the best interest of the child—the Opinion clearly requires a somewhat different articulation of findings by the trial court than had previously been regarded as permissible. Accordingly, we intend that that aspect of this Opinion be applied to the case at hand but otherwise prospectively only, and that it not apply to cases in which, as of the date the mandate is issued, a final TPR judgment has been entered by a Circuit Court and no timely appeal is pending from that judgment.

either a finding of unfitness or exceptional circumstances must be found after the statutory provisions are addressed in order for parental rights to be terminated under the statute. I have a strong belief that the Constitutions of the United States and Maryland are paramount to any statute that may be enacted. In my view, the fundamental constitutional right of parents to raise their children is to be addressed normally by an initial finding of either parental unfitness or extraordinary circumstances. Before a trial court addresses the statutory factors it should address the unfitness/extraordinary factors prior to considering elements in the statute. In simplified form, I believe that the majority has the cart before the horse, but, nonetheless, has arrived at the right destination, albeit in reverse. Chief Judge Bell joins in the concurrence.