Circuit Court for Baltimore City
Case No. T15280012

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2719

September Term, 2016

_____

IN RE: ADOPTION/GUARDIANSHIP
OF H.W.

_____

Wright,
Arthur,
Salmon, James P.
    (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Arthur, J.

_____

Filed:  September 28, 2017

The Baltimore City Department of Social Services petitioned the Circuit Court for Baltimore City, sitting as the juvenile court, to terminate the parental rights of H.W.'s biological father. The court found by clear and convincing evidence that there were exceptional circumstances that made the continuation of the father's parental relationship detrimental to H.W.'s best interests. In so doing, the court relied, in part, on the factors from *Ross v. Hoffman*, 280 Md. 172 (1977), which concern whether there are exceptional circumstances that make it detrimental to a child's best interests for a parent to have *custody*. The father appealed.

Although the court engaged in a thorough and conscientious review of all the evidence before it rendered its decision, we must vacate the judgment and remand for further proceedings because the court erred in considering factors related to custody in finding exceptional circumstances that make the continuation of the father's parental relationship detrimental to H.W.'s best interests.

### FACTUAL AND PROCEDURAL HISTORY

**A. H.W.'s Life**

Appellant M.W. ("Father") is the biological father of a son, H.W., who was born in April of 2012. At the time of H.W.'s birth, Father was incarcerated in Connecticut. Father has never met H.W., and H.W. does not know of Father's existence.

On September 5, 2012, while Father was incarcerated in Connecticut, H.W.'s mother ("Mother") left him unattended in a bathtub. When she returned, H.W. was face down in the water. He almost drowned. The child was hospitalized and spent two weeks on life-support.

On September 28, 2012, H.W. was placed into the custody of the Baltimore City Department of Social Services under an emergency authorization. On October 1, 2012, the Department filed a petition alleging that H.W. was a child in need of assistance or "CINA."[1] On approximately December 3, 2012, the juvenile court found that H.W. was a CINA, but left him in Mother's custody under an order of protective supervision. Father was still incarcerated in Connecticut when these events occurred.

On January 13, 2013, Father was released from prison and placed on probation in Connecticut. He has testified that he was not allowed to leave Connecticut without official permission and that he could not move to Baltimore, because his family could not sponsor him. He lived for some time in a homeless shelter and did not complete a drug-treatment program for marijuana abuse.

For reasons that are unclear from the record, the court entered an emergency order authorizing H.W.'s removal from Mother's residence on May 14, 2013, but returned him to Mother's custody, under the order of protective supervision, on July 22, 2013. On December 12, 2013, the court terminated H.W.'s CINA case.

In January 2014, Mother gave birth to fraternal twins, H.W.'s half-brother and half-sister. Five months later, on June 8, 2014, Mother left H.W.'s half-brother in the sink, unattended, while she tended to his half-sister, who was choking in another room.

---

[1] A "Child in Need of Assistance" is a child who requires court intervention because he or she has been abused, neglected, has a developmental disability and/or mental disorder, and his or her parents, guardian, or custodian are either unwilling or unable to provide proper care and attention to the child and the child's needs. Md. Code (1974, 2013 Repl. Vol.), § 3-801(f) of the Courts and Judicial Proceedings Article.

The infant boy suffered burns on over 18 percent of his body and was hospitalized for 25 days.

On June 9, 2014, the day after H.W.'s half-brother suffered his burns, the Department filed a petition for shelter care on behalf of H.W. and his two half-siblings. At the time, H.W. had a healed burn to the right side of his forehead, which, Mother said, he had suffered when he ran into a lit cigarette while playing. The court placed H.W. and his half-siblings into shelter care.[2]

On June 20, 2014, the Department placed H.W. and his half-sister in the care of their foster parents, the Ms. H.W. and his half-sister have lived with the Ms. since that date. H.W.'s half-brother joined them at a later date, after he had recovered from his burns, and after Mr. and Ms. M. had constructed an extra room to accommodate all of the children.

Lori Lee, a permanency worker for the Department, investigated Father's whereabouts and received information indicating that he was incarcerated in Kentucky. She sent him a letter on July 10, 2014, but received no response.

The court scheduled a six-month review hearing on H.W.'s permanency plan for the afternoon of December 9, 2014. Father testified that he found out about the hearing about a month before it occurred (though he was unsure how). He evidently received permission to travel to Baltimore for the hearing, but showed up in the morning rather

___

[2] The burn on H.W.'s forehead had been the subject of a neglect investigation that began on or before May 27, 2014. The investigation revealed that Mother did not seek medical attention for the burn. The investigation also revealed that Mother was not providing adequate nourishment for H.W. and his half-siblings.

than in the afternoon. He spoke to Ms. Lee, told her that he was on probation in Connecticut (and not incarcerated in Kentucky), and asked to visit with H.W. Ms. Lee told Father that she would pick up H.W. and bring him to the courthouse, but Father said that he was unable to stay because he had bought a ticket on a bus that was leaving at 2:00 or 3:00 p.m. It appears that Father may have managed to get a ticket for a later bus (he did not need to get back to work in Connecticut until 7:00 p.m. the following evening), but he did not use the extra time to see H.W. He left the courthouse with Mother and has not returned to Maryland since that date.

Over the first eight months of 2015, Ms. Lee spoke to Father (and his probation officer) on one occasion and sent him several letters about upcoming hearings. She received no response to the letters. In August 2015, she learned that Father had been reincarcerated. He had violated his probation in several ways, including by testing positive for the use of marijuana.

In October 2015, while he was incarcerated, Father wrote to Ms. Lee and expressed his desire to "be in [H.W.'s] life." He suggested his aunt or his brothers as resources for H.W. Ms. Lee, however, could not locate the brothers. (Father had not supplied contact information for them.) The aunt declined to become a placement resource. On November 12, 2015, Ms. Lee informed Father of these developments.

Between March 2016 and November 2016, Ms. Lee wrote to Father on five occasions. She asked him to communicate with her if his situation changed or if he had other relatives whom he would like to propose as a resource. Father did not respond.

4

Meanwhile, on October 20, 2015, the Department filed a petition to terminate Mother's and Father's parental rights with respect to H.W. *See* Md. Code (1984, 2012 Repl. Vol.), § 5-323 of the Family Law Article ("FL"). On May 9, 2016, Mother consented to the termination of her parental rights. On September 22, 2016, Father consented as well, but he withdrew his consent on the following day.

**B. The TPR Hearing**

A hearing on the Department's petition commenced on January 12, 2017, and was completed on February 9, 2017. Ms. Lee and Father testified.

Ms. Lee testified that the foster parents, the Ms., provide H.W. with proper medication and therapy (he has ADHD), an education, and stable living conditions. She stated that H.W. calls his foster parents "Pop Pop" and "Mommy," that H.W. is very close to "Pop Pop," that he views them as his providers and protectors. H.W.'s two half-siblings live in the foster home as well, and Ms. Lee said that he "is truly a big brother" to them. She expressed her view that it would be "detrimental to remove [H.W.]" from the Ms.' home.

Participating by telephone, Father testified that when he was on probation in Connecticut, he could not travel to Maryland without permission. He claimed that during that time he sent some money to Mother for H.W.'s support. When he is released from prison, he said, he intends to return to Baltimore and to attempt to get custody of H.W. Nonetheless, he agreed that he had no set plans about what he would do upon his return to Baltimore, that he did not expect much help from his family, that he has a history of drug abuse, and that he has failed to complete drug-treatment programs to which he was

5

referred in the past. Father also agreed that he has not been able to provide for himself in the past, but he said that he was reading books and educating himself and taking a course called "Good Intentions, Bad Choices."[3] He envisioned that he and H.W. would stay in Baltimore for only a few years, but he expressed a desire to ensure that H.W. remained in contact with his half-siblings. He has a mandatory release date of February 23, 2018, and an anticipated release date of December 25, 2017.

### C. The TPR Order

On February 10, 2017, the court issued an order terminating Father's parental rights. In a thorough written opinion, the court reviewed the evidence in light of FL § 5-323(b), which allows for the termination of parental rights if "a juvenile court finds by clear and convincing evidence that a parent is unfit to remain in a parental relationship with the child or that exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child such that terminating the rights of the parent is in a child's best interests[.]"

After considering each of the relevant statutory factors in FL § 5-323(d), the court could not find clear and convincing evidence of Father's unfitness to remain in a parental relationship with the child. Consequently, the court looked to whether the Department had shown clear and convincing evidence of exceptional circumstances that made a continuation of the parental relationship detrimental to the best interests of the child.

---

[3] The record does not disclose the subject matter of the course, but it appears to focus on helping offenders to reenter society upon their release from prison or jail. http://www.fmsproductions.com/index.php/presenters/dr-stanton-samenow/good-intentions-bad-choices-series.html (last viewed Aug. 9, 2017).

In deciding the issue of "exceptional circumstances," the court expressly incorporated the factors for determining whether "there are exceptional circumstances which make custody in the parent detrimental to the best interest of the child" in a custody dispute between a parent and a third party. *Ross v. Hoffman*, 280 Md. at 178-79. Those factors include:

> the length of time the child has been away from the biological parent, the age of the child when care was assumed by the third party, the possible emotional effect on the child of a change of custody, the period of time which elapsed before the parent sought to reclaim the child, the nature and strength of the ties between the child and the third party custodian, the intensity and genuineness of the parent's desire to have the child, [and] the stability and certainty as to the child's future in the custody of the parent.

*Id.* at 191; *see also Burak v. Burak*, ___ Md. ___, 2017 WL 3712247 (Aug. 29, 2017).

Because *Ross v. Hoffman* concerns custody disputes, at least two of those factors expressly relate only to a change of custody: "the possible emotional effect on the child of a change of custody" and "the stability and certainty as to the child's future in the custody of the parent." Those factors do not concern the existence of exceptional circumstances that make a continuation of the parental relationship detrimental to the best interests of the child.

On the basis of the factors in *Ross v. Hoffman*, including the factors that expressly relate only to a change in custody, the court found, by clear and convincing evidence, that the Department had shown exceptional circumstances that made a continuation of the parental relationship detrimental to the best interests of the child. Father appealed.

7

Father presents two questions, which we quote:

1. Did the court apply the wrong factors to determine whether there were "exceptional circumstances" warranting termination of Appellant's parental rights?

2. Did the court erroneously conclude that there were "exceptional" circumstances warranting termination of the parental relationship, where Appellant was found not to be an unfit parent, had a mandatory release date from incarceration within 13 months of the TPR hearing, and was not provided adequate services to facilitate reunion with his son?

Because we answer the first question in the affirmative, we decline to address the second. We must vacate the judgment and remand for further proceedings.

## DISCUSSION

Appellate courts apply different and interrelated standards for reviewing different aspects of a juvenile court's decision to terminate parental rights. *See In re Adoption of Ta'Niya C.*, 417 Md. 90, 100 (2010) (citation omitted). For purposes of this appeal, it is sufficient to observe that we conduct a de novo review of the court's legal conclusions. *See In re Adoption of Jayden G.*, 433 Md. 50, 96 (2013) (citing *In re Adoption of Ta'Niya C.*, 417 Md. at 100).

When the State petitions to terminate parental rights without a parent's consent, the court's paramount consideration is the best interests of the child. *In re Adoption of Jayden G.*, 433 Md. at 82 (citing *In re Adoption of Ta'Niya C.*, 417 Md. at 94). Recognizing that parents have a constitutionally-protected interest in raising their children without undue State interference, Maryland law presumes that it is in the best interest of children to remain in the care and custody of their parents. *In re*

*Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 495 (2007) (citations omitted).

The natural rights of parents, however, are "not absolute." *Id*. at 497. Rather, the parents' rights "must be balanced against the fundamental right and responsibility of the State to protect children, who cannot protect themselves, from abuse and neglect." *Id.* at 497. Thus, in appropriate cases the "presumption that the interest of the child is best served by maintaining the parental relationship . . . may be rebutted . . . by a showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest." *Id.* at 498. Since 2009, those considerations have been set forth explicitly in FL § 5-323.

"[T]he trial court must consider the statutory factors listed in subsection (d) [of § 5-323] to determine whether exceptional circumstances warranting termination of parental rights exist." *In re Adoption of Ta'Niya C.*, 417 Md. at 103-04 (footnotes omitted). "[T]he same factors that a court uses to determine whether termination of parental rights is in the child's best interest under the TPR statute equally serve to determine whether exceptional circumstances exist." *Id.* at 104 (citing *In re Adoption/Guardianship of Rashawn H.*, 402 Md. at 499). "Those factors, though couched as considerations in determining whether termination is in the child's best interest, serve also as criteria for determining the kinds of exceptional circumstances that would suffice to rebut the presumption favoring a continued parental relationship and justify termination of that relationship." *In re Adoption/Guardianship of Rashawn H.*, 402 Md. at 499; *accord In re Adoption of Ta'Niya C.*, 417 Md. at 104.

"In addition to these statutory factors, courts may consider 'such parental characteristics as age, stability, and the capacity and interest of a parent to provide for the emotional, social, moral, material, and educational needs of the child.'" *In re Adoption of Ta'Niya C.*, 417 Md. at 104 n.11 (quoting *Pastore v. Sharp*, 81 Md. App. 314, 320 (1989)). Indeed, the governing statute itself does not confine the court's analysis to the factors specifically enumerated therein: it states that "a juvenile court shall give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests, including" the factors enumerated in the statute. FL § 5-323(d).

In *In re Adoption/Guardianship of Rashawn H.*, 402 Md. at 494, a termination of parental rights or "TPR" case, the mother's argument "borrow[ed] in part from cases involving custody disputes between a parent and a third party[.]" Consequently, the Court of Appeals undertook to explain the conceptual differences between TPR proceedings and third-party custody disputes:

> Custody and visitation disputes, even between a parent and a third party, are on a different plane than TPR proceedings. . . . [W]e regard TPR proceedings as unique—different in kind and not just in degree. . . . First, a TPR judgment does not just allocate access to a child but constitutes a total rescission of the legal relationship between parent and child, and that rescission is generally final. Unlike custody or visitation orders, it is not subject to reconsideration merely upon a showing of changed circumstances on the parent's part. Second, in custody and visitation cases the State is essentially neutral, providing only a judicial forum for resolution of the dispute between two private parties. In TPR cases, the State is a moving party, acting in its capacity as *parens patriae*. It is seeking to terminate the existing parental relationship and transfer to itself, hopefully for re-transfer to an adoptive family, the parental rights that emanate from that relationship.

10

*Id.* at 495-96 (citations and quotation marks omitted).

The notion of "exceptional circumstances" has "a different connotation in TPR cases" from its connotation "in custody and visitation disputes[.]" *Id.* at 498. "In a custody case, . . . exceptional circumstances are those that would make parental *custody* detrimental to the best interest of the child[,]" *id.* (emphasis in original), not those that would make it detrimental to the child's best interest for the parent to "remain the child's parent." *Id.*

"The deficiencies that may properly lead to a finding of . . . exceptional circumstances in a custody case will not necessarily suffice to justify a TPR judgment." *Id.* "For one thing," in a custody case, "those deficiencies may be temporary and correctable – sufficiently severe to warrant denying custody or visitation at a particular point in time, but with the understanding that the custody or visitation decision is subject to reconsideration upon a showing of changed circumstances." *Id.* "[H]owever, a judgment terminating parental rights, once enrolled, is not subject to discretionary reconsideration based merely on the parent's changed circumstances." *Id.*

"To justify a TPR judgment, therefore, the focus *must* be on the continued parental relationship, *not custody*." *Id.* at 499 (emphasis added). "The facts must demonstrate . . . exceptional circumstances that would make a continued parental relationship detrimental to the best interest of the child." *Id.*

Although a court may use factors outside of those prescribed in FL § 5-323(d) when determining whether the termination of parental rights is proper, *Ta'Niya C.*, 417 Md. at 104 n.11, the court in this case relied on the factors in *Ross v. Hoffman*, a third-

party custody dispute. In a section entitled "Factors for determining whether exceptional circumstances exist[,]" the court listed nine factors, four of which explicitly refer to custody:

> 3. Possible emotional effect on child if custody changed to biological parent . . . .
>
> 4. Possible emotional effect on child if custody is given to caretaker . . . .
>
> 8. Stability and certainty as to child's future in the custody of the parent . . . .
>
> 9. Stability and certainty as to child's future in custody of the caretaker[.]

By using factors related only to custody to aid in its decision to terminate Father's parental rights, the court examined this case through the wrong lens. Given the important differences between the exceptional circumstances inquiry in TPR proceedings and the exceptional circumstances inquiry in custody matters, we cannot say that it was harmless error for the court to focus in part on custody in reaching its decision to terminate Father's parental rights.

We agree with the Department that some of the *Ross v. Hoffman* factors are completely consistent with the statutory factors in § 5-323(d) and, hence, are relevant to whether a continued parental relationship would be detrimental to the best interest of the child. The length of time the child has been away from the biological parent, the age of the child when care was assumed by the third party, the period of time that elapsed before the parent sought to reclaim the child, and the nature and strength of the ties between the child and the third-party custodian all bear on "the child's emotional ties with and feelings toward the child's parents, the child's siblings, and others," such as the foster

parents, "who may affect the child's best interests significantly." FL § 5-323(d)(4)(i).

Those factors may also bear on the child's adjustment to community, home, placement, and school (*id.* § 5-323(d)(4)(ii)) and on "the likely impact of terminating parental rights on the child's well-being." *Id.* § 5-323(d)(4)(iv). In a case like this, in which the child has never met his biological father and does not even know of the father's existence, they may also bear on "the child's feelings about severance of the parent–child relationship[.]" *Id.* § 5-323(d)(4)(iii). But the *Ross v. Hoffman* factors that expressly pertain to custody – the possible emotional effect on the child of a change of custody and the stability and certainty as to the child's future in the custody of the parent – do not belong in a TPR analysis.

On remand, if the court confines its evaluation to factors relating to the termination of parental rights, it may well reach exactly the same conclusion as it previously reached. However, we cannot uphold the court's conclusion, careful and considered as it otherwise was, because it used factors that expressly related to custody in determining whether there were exceptional circumstances that would make a continuation of the parental relationship detrimental to the best interests of the child such that terminating Father's parental rights is in H.W.'s best interests. Accordingly, we vacate the judgment and remand for further proceedings consistent with this opinion.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY, SITTING AS A JUVENILE COURT, VACATED.  CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.  COSTS TO BE PAID BY APPELLEE BALTIMORE CITY DEPARTMENT OF SOCIAL SERVICES.**

14